

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TM:EAG/AL/GP
F.#2010R00153

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 5, 2012

<u>By ECF</u>

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re: United States v. Andrew Russo, <u>et al.</u>
       <u>Criminal Docket No. 11-30 (KAM)</u>

Dear Judge Matsumoto:

   The government respectfully submits this letter in opposition to Andrew Russo's appeal of the decision of the Honorable Cheryl L. Pollak, United States Magistrate Judge, to enter a permanent order of detention as to Andrew Russo pending trial. For the reasons set forth below, Andrew Russo poses a danger to the community, and should therefore be detained pending trial.

BACKGROUND

   The government proffers the following facts concerning the charges at issue and pretrial detention.[1] <u>See</u> <u>United States v. LaFontaine</u>, 210 F.3d 125, 130-31 (2d Cir. 2000) (the government is entitled to proceed by proffer in a detention hearing); <u>United States v. Ferranti</u>, 66 F.3d 540, 542 (2d Cir. 1995) (same); <u>United States v. Martir</u>, 782 F.2d 1141, 1145 (2d

---

   [1] The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

Cir. 1986) (same).[2]  Additional facts are contained in the
government's motion for permanent orders of detention as to
various defendants in the above-referenced case, filed in this
case on January 20, 2011, which is attached as Exhibit A and
incorporated by reference.

I.   <u>The Defendant's Leadership of the Colombo Crime Family</u>

    A.   <u>Andrew Russo's Pre-Arrest Leadership</u>

       As of the time of his arrest on January 20, 2011, the
defendant Andrew Russo was the acting boss of the Colombo
organized crime family of La Cosa Nostra (the "Colombo crime
family").  Andrew Russo acknowledged his assumption of this
position on several recordings made by a cooperating witness
("CW-1").  For example, on May 11, 2010, CW-1 recorded a meeting
between Andrew Russo, Colombo crime family soldier and co-
defendant Ralph Scopo, CW-1 and others.  During the consensually
recorded meeting, CW-1 introduced Andrew Russo as the boss of the
Colombo crime family to Scopo.  Specifically, CW-1 described
Russo as the "representante" and then Scopo congratulated Andrew
Russo, which he accepted.  Two other cooperating witnesses have
also advised that Andrew Russo was the acting boss of the Colombo
crime family at the time of his arrest in January 2011.

       In his position of acting boss, Andrew Russo vocalized
that he had taken – in his words – numerous steps to "put the
family back together again."  Andrew Russo's reference stemmed

---

[2]    As the Second Circuit has explained:

    [I]n the pre-trial context, few detention
    hearings involve live testimony or cross
    examination.  Most proceed on proffers.  <u>See
    United States v. LaFontaine</u>, 210 F.3d 125,
    131 (2d Cir. 2000).  This is because bail
    hearings are "typically informal affairs, not
    substitutes for trial or discovery."  <u>United
    States v. Acevedo-Ramos</u>, 755 F.2d 203, 206
    (1st Cir. 1985) (Breyer, J.) (quoted
    approvingly in <u>LaFontaine</u>, 210 F.3d at 131).
    Indeed, § 3142(f)(2)(B) expressly states that
    the Federal Rules of Evidence do not apply at
    bail hearings; thus, courts often base
    detention decisions on hearsay evidence.  <u>Id.</u>

<u>United States v. Abuhamra</u>, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

back to the early 1990s, when there was an internal war within the Colombo crime family.  In the several months prior to his arrest in January 2011, Andrew Russo reached out to the various members of the Colombo crime family who were not then incarcerated to try and get them to pledge their commitment to the Colombo crime family.  He was captured on a consensual recording indicating that any individual who did not demonstrate a commitment to come back into the family would be placed on his list of enemies, that he would share that list with other organized crime families, and that he would indicate that anyone in other organized crime families who associated with those individuals would also be placed on his list of enemies. Following is a transcript:[3]

> AR:     What my intentions are -
>
> CW-1:   I'm glad he came right into you right away
>
> AR:     Yeah.
>
> CW-1:   Said it was important to me.
>
> AR:     Yeah, I'm glad.  I'm happy.  Uh – I was gonna say something.
>
> UM:     [UI] intentions.
>
> AR:     Yeah, what my intentions are that when I'm finished, who really doesn't want to come in, I'm making up a list.  I'm giving it to all the bogatas and they're outlaws. Anybody that deals with them is my enemy.  I'm making it as clear as that.

A copy of an excerpt of that recording is included on a compact disk attached as Exhibit B and named "5.11.10.intentions.mp3."

As the acting boss of the Colombo crime family, Andrew Russo met frequently with his captains to stay abreast of the affairs of the Colombo crime family.  For example, on June 29, 2010, CW-1 recorded a meeting of the Colombo crime family

---

[3]     All transcriptions provided herein are based on draft transcripts.

administration and several of its captains; agents with the
Federal Bureau of Investigation ("FBI") also conducted physical
surveillance of the meeting.[4]  On September 9, 2010, Russo held a
second meeting of his administration and several of the captains;
FBI agents also conducted physical surveillance of that meeting.[1]
Notably, Andrew Russo relied upon his numerous captains and their
crews to carry out the violent criminal activities of the Colombo
crime family.  For example, on one consensual recording made by
another cooperating witness ("CW-2"), Anthony Russo, one of
Andrew Russo's most reliable captains, said:

> Anthony Russo:  I haven't been anywhere.
> Every time I turn around,
> there's a problem I gotta go
> handle.  Why do I have to
> handle?
>
> CW-2:           Why do you gotta go all the
> time?

---

[4]     The June 29, 2010 meeting occurred at a residence in
Staten Island.  In attendance was Andrew Russo, his son William
"Billy" Russo (captain), Benjamin Castellazzo (underboss), Richie
Fusco (consigliere), Dennis Delucia (captain), Anthony Russo
(acting captain), Joseph Carna (captain) and CW-1.  Anthony Russo
is now cooperating with the government and available to testify
about the meeting.

[1]     The September 9, 2010 meeting took place at a different
residence in Staten Island.  In attendance at that meeting were
Andrew Russo, Benjamin Castellazzo (underboss), Richie Fusco
(consigliere), Dennis Delucia (captain), Reynold Maragni
(captain), Anthony Russo (acting captain) and Joseph Savarese
(soldier), among others.  In addition to Anthony Russo, Maragni
is also cooperating with the government and available to testify
as to what transpired at the meeting.  Another cooperating
witness ("CW-3"), who was wearing a recording device, drove
Anthony Russo to the meeting location, drove Maragni away from
the meeting location, and later he drove Anthony Russo and
Castellazzo away from the meeting location.  During that
transport, CW-3 learned from Anthony Russo and Castellazzo that
there was some kind of dispute between Andrew Russo and Maragni
where Maragni was told to leave the meeting and that during the
meeting the participants discussed individuals whose names were
brought up as possibilities for being proposed for membership in
the Colombo crime family.

4

> Anthony Russo: I don't know, the guy [Andrew
>                Russo] wants me to go.  I'm
>                gonna go to jail.

Anthony Russo also explained to CW-2 the requirements set by
Andrew Russo to become an inducted member of the Colombo crime
family: "First, he's gotta be capable in here [<u>i.e.</u>, his head].
And he's gotta be capable to do this [<u>i.e.</u>, murder].  They gotta
be capable to do time [<u>i.e.</u>, jail time].  They gotta be capable
of everything."

    B.    <u>Andrew Russo's Post-Arrest Leadership</u>

      Andrew Russo has continued to rule the affairs of the
Colombo crime family since his incarceration in January 2011.
For example, on the day of his arrest, Russo presided over a
secret ceremony at which longtime Colombo crime family associate
and co-defendant Larry Sessa was inducted into the Colombo crime
family.

      More recently, in November 2011, Russo appointed long-
time Colombo crime family soldier Thomas Farese as the
consigliere of the Colombo crime family.  Andrew Russo's
participation in this decision was captured on a consensual
recording made of Farese by Colombo crime family member and co-
defendant Reynold Maragni.  Specifically, during a recording made
by Maragni on November 14, 2011, Farese advised Maragni that
"Andrew [Russo] wants me in a position[,]" a reference to a
position on the Colombo crime family administration.  The
following is a transcript of a subsequent excerpt of the November
14, 2011 consensually-recorded conversation:

> TF:  It's hard to talk to Andrew because –
>      unless you're in there [a reference to
>      the Metropolitan Detention Center in
>      Brooklyn, New York, where Andrew Russo
>      is currently incarcerated] – because I
>      wouldn't send someone in there to -
>
> RM:  No.
>
> TF:  Ask him any questions.   They [UI]-
>
> RM:  No, no you can't.  No you can't.
>
> TF:  What I did was, what I wind up, wind up.
>       Call his family, he said, tell him that
>      a close friend of Tommy's or whoever is

5

> coming in to say hello to him.  Said,
> "Okay."  The lawyer asked him one, first
> of all, the lawyer's involved in that
> entertainment business so he got along
> good with Andrew.

RM:  Um hum.  Um hum.  Right.

TF:  But he asked him one question.  I'm only
here to ask you one question if I may.
Tommy got a message, he wants to know if
the message came from you.  Yes or no, I
don't want to know, don't tell me
anything else.  Andrew said, "Yes."

RM:  Good.

TF:  And that was that.

Maragni has advised that he understood the Farese's statements to
mean that Farese had a lawyer meet with Andrew Russo at the
Brooklyn MDC to confirm that Andrew Russo – as opposed to someone
else – had sent the message to Farese that Farese should assume a
position on the Colombo crime family administration, and that
Andrew Russo had confirmed that he was the originator of the
message to Farese.  A review of records from the Metropolitan
Detention Center in Brooklyn, New York, revealed that a Florida-
based lawyer – not the lawyer representing Andrew Russo in the
above-referenced case – visited Andrew Russo on October 13, 2011
for approximately eight minutes.

II.  The Defendant Has Sanctioned Crimes of Violence

The defendant is charged with racketeering conspiracy,
including violent crimes as predicate acts, and other crimes of
violence.  Specifically, Andrew Russo is charged with
(1) racketeering conspiracy, in violation of 18 U.S.C. § 1962
(Count Two);[2] (2) extortion conspiracy, in violation of 18 U.S.C.
§ 1951 (Count Forty-one); and (3) loansharking conspiracy, in
violation of 18 U.S.C. § 894 (Count Forty-nine).

---

[2]   Andrew Russo is named in Racketeering Acts sixteen and
twenty-three.

1.   Conspiracy to Extort the Gambino Family

As alleged in Count Two (Racketeering Act Sixteen) and Count Forty-One, Andrew Russo, together with co-defendants Benjamin Castellazzo, Dennis Delucia, Richard Fusco and Anthony Russo, conspired to extort members and associates of the Gambino organized crime family of La Cosa Nostra (the "Gambino crime family") of money to pay for medical care and other expenses incurred by Colombo crime family associate Walter Samperi.  On May 16, 2010, Samperi was stabbed by an individual affiliated with the Gambino crime family.  To compensate, members of the Colombo crime family initiated a formal dispute, or "beef," with a member of the ruling panel of the Gambino crime family.

After a series of meetings, or "sit-downs," with members of the Gambino crime family, the Colombo crime family administration members and the New York City-based captains met at a residence in Staten Island, where they discussed, among other things, the dispute over Samperi.  The meeting was captured on a recording made by CW-1.  Andrew Russo, as the acting boss of the Colombo crime family, presided over the meeting.  At the outset, Andrew Russo admonished Anthony Russo and the others present that they should not attend a sit-down with another LCN family without first alerting the Colombo crime family administration.  With respect to the stabbing of Samperi, Andrew Russo observed that they should have first "g[o]t even" and then initiated discussions with the Gambino crime family.

The administration and the captains then discussed a variety of ways to obtain compensation for Samperi.  They ultimately agreed that, in exchange for their promise not to retaliate, the Colombo crime family would require the Gambino family to make a one-time payment of $150,000, $100,000 of which was to come from the Gambino family's "basket" from the "feast," a reference to an annual Italian feast held in late August on 18th Avenue in Brooklyn, the Figli di Santa Rosalia.[3]

2.   Conspiracy to Use Extortionate Means
     to Collect a Debt - John Doe #16

On or about September 30, 2010, CW-1, who was equipped with a recording device, met with Colombo crime family street boss Andrew Russo and acting captain Anthony Russo.  During the

---

[3]   Consensual recordings made during the course of the investigation demonstrate that the Colombo crime family has controlled the Figli di Santa Rosalia for several years.

recorded meeting, Andrew Russo and Anthony Russo engaged in the
following discussion:

| | |
|---|---|
| Andrew Russo: | Joe Pesci's, Joe Pesci's cousin.  He beat some kid.  Invested on the Strip.  Took 70,000.  When they went, when they went to grab him, [he said,] "I blew it, I don't have it."  I'm trying to look into it.  This kid, you know the kid, Federico Castelluccio? |
| Anthony Russo: | No. |
| Andrew Russo: | The kid who played Furio on the Sopranos.  [U/I] Came from Italy. |
| Anthony Russo: | Oh yeah, okay, yeah. |
| Andrew Russo: | He's [U/I] |
| Anthony Russo: | Okay. |
| Andrew Russo: | Maybe we could. |
| CW-1: | Who's this, Joey Colombo? |
| Andrew Russo: | No, no. |
| CW-1: | Same guy. |
| Andrew Russo: | Joey Colombo's another guy.  That's Chris Colombo. |
| CW-1: | Oh Chris. |
| Anthony Russo: | Gotta line on him?  He knows where he is? |
| Andrew Russo: | That's Joe Pesci's cousin.  First cousin. |
| Anthony Russo: | What's his name? |
| Andrew Russo: | Pesci. |

8

```
Anthony Russo:  No, Joe Pesci, what's his
                cousin's name?

Andrew Russo:   I don't know.  I don't know.
                I can get his name.  First
                [U/I] Joe Pesci's cousin, you
                can find out who it is.  I'll
                get you all the information.

Anthony Russo:  Okay.

                      *  *  *
Andrew Russo:   I don't think Joe bothers with
                his cousin.  He's a swindler.
```

3.   Meeting with Neil Migliore

On or about October 6, 2010, CW-1, who was equipped with a recording device, met with Andrew Russo and a high-ranking member of the Luchese organized crime family of La Cosa Nostra (the "Luchese family") Neil Migliore ("NM").  During the recorded meeting, Andrew Russo and Migliore discussed an individual who owed money to someone.  Migliore raised the situation to Andrew Russo because he believed that the debtor was "around" Andrew Russo.  Andrew Russo acknowledged that the debtor's partner was "around" him, but advised that the debtor was not and stated that "somebody else [had] c[o]me to me [Andrew Russo] a few weeks ago and said we're gonna go to work on him [the debtor].  They owe someone.  I [Andrew Russo] said God bless him."

III. <u>Detention Hearing</u>

On January 25, 2011, the Honorable Cheryl Pollak held a
detention hearing, at which Special Agent Scott Curtis with the
Federal Bureau of Investigation ("FBI") testified.  After hearing
Agent Curtis's testimony, Judge Pollak found:

Obviously the issue here is not whether or
not Mr. Russo has personally committed
violence.  The Government is not raising that
as its argument in moving for detention on
grounds of dangerousness.  Instead, the
Government has proffered evidence that
frankly has not been controverted at this
point, that Mr. Russo is or was the street
boss of the Colombo crime family during the
period from March of 2010 until I assume his
arrest and that he poses a serious danger to
the community in his role as street boss
presiding over high ranking members of the
organization ordering and directing their
activities, which is information based on the
agent's testimony coming from not only the
numerous recordings that we've discussed and
surveillance by the FBI but also information
from confidential informants -- several
confidential informants who according to the
testimony have each provided corroborating
evidence that the defendant is, in fact, or
has been since March the street boss
responsible for directing the Colombo crime
family while the actual bosses are in
custody.

We also have evidence proffered by the
Government that during this period of time
members of the racketeering enterprise
engaged in violent criminal activities
including among other things extortion which
by its very nature is considered to be an act
of violence under the bail or format and that
threats of force and intimidation are used to
collect monies and force others to engage in
acts in response to those threats.  I think
that's actually something that was noted in
the <u>United States v. Defitti</u> [ph.] case
[<u>United States v. Defede</u>, 7 F. Supp. 2d 390,
395-96 (S.D.N.Y. 1998),] which counsel, I

10

believe, you brought to the Court's attention earlier this morning.

I have considered all of these things.  I find by clear and convincing evidence that the Government has established for purposes of bail that there is a serious danger to the community based on the defendant's role.  It is not a <u>per</u> <u>se</u> finding that I am making.  It is a finding based upon the testimony of the agent and the activities of the enterprise as defined by the agent and also as described in the indictment.  And while I understand that there is contrary evidence to suggest that Mr. Russo has provided assistance and aided members of the community which obviously is a laudable thing, that does not rebut or counteract the concern that the Court has about releasing him at this time.  As the Government noted, the Second Circuit has previously held in <u>United States v. Scottie</u> [Ph.] and <u>United States v. Erena</u> [Ph.] [<u>Orena</u>, 986 F.2d 628, 630-33 (2d Cir. 1993),] that stringent conditions of release for people such as Mr. Russo are not sufficient when we have a finding of danger to the community.  So based on all that I'm going to order the defendant be detained pending trial.

(Tr. 66-68).  A copy of a transcript of the detention hearing is attached as Exhibit C.

<u>DISCUSSION</u>

I.   <u>Legal Standard</u>

   A.   <u>Bail Reform Act</u>

        Under the Bail Reform Act, 18 U.S.C. § 3141 <u>et</u> <u>seq.</u>, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  <u>See</u> 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence.

11

See Ferranti, 66 F.3d at 542; United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).

B.   Organized Crime Defendants

Courts in this circuit have routinely faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses.  See, e.g., United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); United States v. Defede, 7 F. Supp. 2d 390, 395-96 (S.D.N.Y. 1998) (Luchese family acting boss Joseph Defede detained as danger to the community); United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand, at the very least, for the following propositions: (1) leaders of a violent organized criminal enterprise are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (3) elaborate bail packages involving home detention and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

        i.   Organized Crime Leaders Are
             Dangers to the Community

      Pretrial detention is warranted where, as here, a defendant, charged with violent crimes, is a leader or high-ranking member of a criminal organization whose activities routinely include violence and threats of violence.  See Ciccone, 312 F.3d at 543; United States v. Colombo, 777 F.2d 96, 99-100 (2d Cir. 1985); United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996).  Courts in this circuit have recognized that when organized crime depends on a pattern of violent conduct of the sort charged in this case, the risk to the community is substantial and justifies detention.

      For example, in Defede, Joseph Defede was charged with extortion and extortion conspiracy.  The district court ordered Defede's pretrial detention, finding that the government had shown by clear and convincing evidence that Defede was the acting boss of the Luchese family, thus rendering him a danger to public safety:  "The acting boss of the Luchese family supervises all of its far-flung criminal activities, including acts of violence. Defede's continued liberty therefore presents a substantial danger to the public . . . ."  Defede, 7 F. Supp. 2d at 395.

      More recently, a court in this district denied bail to the acting boss of the Genovese family who "participated at the highest levels in directing an organization alleged in the indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," Cirillo, slip. op. at 7, as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," id. at 11.  The Second Circuit affirmed those findings by summary order. See United States v. Cirillo, 149 Fed. Appx. 40, 43 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only from their own violent activities but from those of subordinates whom they supervise." (citing Ciccone, 312 F.3d at 543)).

      In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization.  Ciccone, 312 F.3d at 542-43; see also Ferranti, 66 F.3d at 543 (noting that the defendant need not have committed the violence himself; he can be deemed dangerous if he directed others to commit acts of

violence) (citing <u>Colombo</u>, 777 F.2d at 98).  As one court has pointed out, an organized crime leader "is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release." <u>Gotti</u>, 219 F. Supp. 2d at 299-300 (citations omitted).

       To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise.  As the court held in <u>Defede</u>:

> [I]t is well established that persons who hold Defede's status routinely engage in conduct that is a menace to public safety. The argument thus is based not on the status, but on the inference that a person in Defede's position is quite likely to engage in dangerous conduct – just as one reasonably could infer that one holding the position of major league baseball pitcher is entirely likely to hurl a small white object in the direction of home plate.

7 F. Supp. 2d at 392 n.4.

       Moreover, in enacting the Bail Reform Act, Congress recognized that certain defendants, such as high-ranking members of an organized crime family fall within a "'small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community.'" <u>Colombo</u>, 777 F.2d at 99 (quoting S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, <u>as</u> <u>reprinted</u> <u>in</u> 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3188-89).

       Nor is the above caselaw narrowly limited to organized crime "bosses" or "acting bosses."  In <u>Salerno</u>, 631 F. Supp. at 1374-75, the court held that a defendant would be a danger to the community if released on bail based on evidence that he was a captain in an organized crime family who managed the enforcement operations of the enterprise.  Likewise, in <u>Colombo</u>, a captain of a crew in the Colombo crime family was ordered detained because the operation of that organization posed a risk to the public and a danger to the community by its "consistent pattern of

orchestrating a series of violent criminal operations." 777 F.2d at 99-100 (internal quotation marks omitted).

> ii. Organized Crime Defendants Are Likely
> to Commit Crimes if Released on Bail

Organized crime defendants also pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities. At bottom, because organized crime defendants are career criminals who belong to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail. See Salerno, 631 F. Supp. at 1375 (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual).

In addition, defendants pose a danger to the community not only when they commit acts of violence, but when it is likely that they will commit even non-violent crimes that are detrimental to the community. See Senate Report at 3195 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."). In Colombo, the court held "[i]n light of Congress' direction that '[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate.'" 777 F.2d at 99 (quoting Senate Report at 3189). In Salerno, the court upheld the detention of two leaders of the Genovese organized crime family, noting:

> The activities of a criminal organization
> such as the Genovese Family do not cease with
> the arrest of its principals and their
> release on even the most stringent of bail
> conditions. The illegal businesses, in place
> for many years, require constant attention
> and protection, or they will fail. Under
> these circumstances, this court recognizes a
> strong incentive on the part of its
> leadership to continue business as usual.
> When business as usual involves threats,

15

> beatings, and murder, the present danger such
> people pose in the community is self evident.

631 F. Supp. at 1375.

> ### iii. Elaborate Bail Packages Are Insufficient to Protect the Community Against Violent Organized Crime Defendants

Finally, the Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants, including leaders of organized crime families shown to be involved in violent criminal activities. See United States v. Dono, Nos. 07-5333-cr(L), 07-5334-cr(CON), 275 Fed. Appx. 35, 2008 WL 1813237, at *2-3 (2d Cir. Apr. 23, 2008) (rejecting conditions that included, among others, home detention and electronic monitoring, and a requirement that the defendant's father – a retired police officer – take "personal responsibility" for the defendant); Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); Colombo, 777 F.2d at 97, 100 (rejecting, among other conditions of release, $500,000 bail secured by real property).

The Second Circuit has viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals. In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (internal citations and quotation marks omitted). See also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal citation and quotation marks omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  See, e.g., Dono, 2008 WL 1813237, at *2-3 (noting that the idea that "'specified conditions of bail protect the public more than detention is flawed'") (quoting Orena, 986 F.2d at 632); United States v. Cantarella, No. 02-CR-307 (NGG), 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); Agnello, 101 F. Supp. 2d at 116 (Gershon, J.) ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

D.   Standard of Review

A district court undertakes a de novo review of a magistrate judge's decision to release or detain a defendant. See United States v. Leon, 766 F.2d 77, 80 (2d Cir. 1985); United States v. Gotti, 358 F. Supp. 2d 280, 282 (S.D.N.Y. 2005); United States v. Smith, No. 02 Cr. 1399, 2002 WL 31521159, at *1 (S.D.N.Y. Nov. 13, 2002).

II.   The Defendant Should Be Detained

A.   The Defendant Is a Danger to the Community

The defendant Andrew Russo poses a substantial danger to the community.  As discussed more specifically below, each of the relevant considerations under the Bail Reform Act strongly favors detention here.

1.   Nature and Circumstances of the Crimes Charged

First, the defendant is charged with crimes of violence under the relevant provisions of the Bail Reform Act, including racketeering conspiracy, extortion conspiracy and conspiring to use extortionate means to collect an extension of credit.  See Ciccone, 312 F.3d at 542 (citing 18 U.S.C. §§ 3156(a)(4)(A), (B))

17

(Bail Reform Act defines a "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"); Chimurenga, 760 F.2d at 404 (conspiracy to commit a crime of violence is a crime of violence for purposes of the Bail Reform Act).

In his motion, Andrew Russo generally challenges the evidence supporting the two specific predicate acts alleged against Andrew Russo as lacking.  His contention is without merit.

As to the conduct alleged in Racketeering Act Sixteen of Court Two and Count Forty-one, the evidence is strong.  As an initial matter, Andrew Russo is incorrect in his conclusory claim that one crime family cannot extort another crime family.  (Mot. at 6).  While the government agrees that when a dispute arises between two crime families, the traditional approach is to schedule a "sit-down" or a meeting between representatives of the two disputing families.  The mere existence of this traditional approach to resolving inter-family disputes, however, does not preclude a crime family from attempting or conspiring to extort another crime family.  In the present case, Andrew Russo was captured on a consensual recording presiding over a meeting at which his highest-ranking members discussed a variety of ways to obtain compensation for Colombo crime family associate Walter Samperi and ultimately agreed that they would solicit a one-time payment of $150,000 from the Gambino crime family, in exchange for which they would agree not to retaliate for the stabbing of Samperi.

As to the conduct alleged in Racketeering Act Twenty-three of Count Two and Count Forty-nine, the evidence supports that Andrew Russo recruited Colombo crime family acting captain Anthony Russo, who is large in size and has a reputation as an enforcer in the Colombo crime family, to locate an individual who owed money to an associate of Andrew Russo.  While Andrew Russo is correct in his claim that there was no discussion about the use of threats (Mot. at 7), Andrew Russo did not need to have this discussion with his loyal associate whom he knew was schooled in organized crime and in collecting outstanding debts.

In any event, the charged racketeering conspiracy provides that Andrew Russo agreed that others would commit a pattern of racketeering activities, including the acts set forth

18

in Count Two of the indictment, which, among other crimes, include extortion, loansharking and illegal gambling.  See United States v Salinas, 522 U.S. 52, 65 (1997) ("In the case before us, even if [the defendant] did not accept or agree to accept two bribes, there was ample evidence that he conspired to violate subsection (c).  The evidence showed that [a co-conspirator] committed at least two acts of racketeering activity when he accepted numerous bribes and that [the defendant] knew about and agreed to facilitate the scheme.  This is sufficient to support a conviction under § 1962(d).");  United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) ("Thus, Gotti need not be named in a predicate act charged in the indictment to be guilty of a racketeering conspiracy that includes that predicate act." (citing Salinas, 522 U.S. at 65));  United States v. Yannotti, 541 F.3d 112 (2d Cir. 2002) (racketeering conspiracy conviction upheld where defendant was convicted of only a single, timely predicate racketeering act).

    2.   History and Characteristics of the Defendant

      The defendant's history and characteristics also clearly favor detention.  Andrew Russo has prior convictions for various felony offenses, including bribery, witness tampering and racketeering.  Notably, Andrew Russo was released from a term of supervised release on or about March 22, 2010, and was shortly thereafter appointed as the acting boss of the Colombo crime family.

      Moreover, Andrew Russo has made clear that he will not hesitate to personally engage in violence.  For example, on one consensual recording, Andrew Russo commented, "I don't hesitate, I've never hesitated" to hurt an individual if the individual stepped out of line.  He has also made clear that he has no intention of disassociating himself from the Colombo crime family or La Cosa Nostra.  He stated, "I can't walk away . . . .  I can't rest."

      In his motion for bail, Andrew Russo asserts that there is not allegation that he has "engaged in violence, directed violence or otherwise sanctioned or encouraged others to participate in violent activities."  (Mot. at 2).  To the contrary, however, as the leader of the Colombo crime family, he has presided over meetings of his high-ranking members of the Colombo crime family, participated in a highly secret induction ceremony, and represented the family in important meetings.  In short, in supervising the activities of the crime family at the highest level, he has sanctioned violence and encouraged others to use and threaten to use violence, and accordingly his

detention is warranted.  See United States v. Cirillo, 149 Fed.
Appx. 40, 43 (2d Cir. 2005) ("This court has affirmed the
detention of the leaders of organized crime enterprises on the
ground that their continued liberty presents a risk to the public
not only from their own violent activities but from those of
subordinates whom they supervise." (citing Ciccone, 312 F.3d at
543)).

        3.    Seriousness of Danger Posed by
             the Defendant's Release

       The seriousness of the danger posed by the defendant's
release cannot be underestimated in light of his membership in
and leadership of the Colombo crime family, a violent criminal
enterprise, and his sanctioning of crimes of violence.  As noted
above, courts in this circuit have recognized that when organized
crime defendants, such as Andrew Russo, are charged with
employing violent conduct, the risk of continued violent conduct
is substantial and justifies detention.  See Salerno, 631 F.
Supp. at 1364.

       As the Second Circuit has clearly held, substantial
bail packages with elaborate conditions, as proposed by Andrew
Russo in his motion for release pending trial, "at best
elaborately replicate a detention facility without the confidence
of security such a facility instills." Orena, 986 F.2d at 632
(citation and internal quotation marks omitted).  The "[s]afety
of the community will be assured only if the government provides
trustworthy, trained staff to carry out the extensive monitoring
of homes, telephones, and travel that would be necessary to
ensure compliance with the conditions of bail." Id. at 632-33.
Similarly, as the circuit has observed, a "court's directives to
the defendants not . . . to have contact with other Colombo crime
family members do not ensure that they will comply." Dono, 275
Fed. Appx. at 37 (citing Colombo, 777 F.2d at 99-100 (reversing
district court's grant of pretrial release and noting that
prohibiting a defendant from intimidating a witness "does not at
all impede his ability to do so, and requires no more of him than
that which the law already demands from . . . every other
citizen").  Thus, to adequately protect the community, the
government would be required, at a minimum, to conduct
surveillance of the defendant's residence, twenty-four hours a
day, seven days a week.

        4.   Evidence of the Defendant's Guilt

       As discussed above, the evidence of the defendant's
guilt is exceedingly strong.  The government intends to prove the

defendant's guilt at trial through the testimony of numerous
witnesses, including cooperating witnesses, many of whom were
once the defendant's co-conspirators.  In addition, the
defendants was intercepted on various consensual recordings
discussing the charged crimes.  Physical and documentary
evidence, such as phone records, and surveillance evidence
underscore the defendant's guilt.

*          *          *

In sum, in considering each of four relevant
"detention" factors, Andrew Russo is a danger to the community
and should be detained.

<u>CONCLUSION</u>

For the reasons set forth above, a permanent order of
detention as to Andrew Russo is warranted.

Respectfully submitted,

LORETTA E. LYNCH
UNITED STATES ATTORNEY

By:   <u>/s/ Elizabeth A. Geddes</u>
Elizabeth A. Geddes
Allon Lifshitz
Gina Parlovecchio
Assistant U.S. Attorneys

cc:  George Galgano, Esq. (by ECF)
     Clerk of the Court (KAM) (by ECF)