TM:EAG/AL
F.#2010R00153

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -             No. 11 CR 30 (SLT)

ANDREW RUSSO, <u>et al.</u>,

           Defendants.

- - - - - - - - - - - - - X


### MEMORANDUM OF LAW IN SUPPORT OF THE <u>GOVERNMENT'S MOTION FOR PERMANENT ORDERS OF DETENTION</u>

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201


ELIZABETH A. GEDDES
JAMES D. GATTA
ALLON LIFSHITZ
Assistant United States Attorneys
    (Of Counsel)

<u>Table of Contents</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . 2

I.   Overview of the Investigation  . . . . . . . . . . . . 3

II.  The Defendants Are Members or Associates of
     the Colombo Family . . . . . . . . . . . . . . . . . . 3

     A.   The Defendants' Positions in the Colombo Family . . . 3

     B.   The Induction Ceremony Scheduled for
          December 7, 2010 . . . . . . . . . . . . . . . . . 4

III. The Defendants Are Charged With Crimes of Violence . . . . 7

     A.   Murder of Joseph Scopo  . . . . . . . . . . . . . . 7

     B.   Robbery - Staten Island Residence . . . . . . . . . 8

     C.   Extortion . . . . . . . . . . . . . . . . . . . . . 9

          1.   Conspiracy to Extort the Gambino Family  . . . . 9

          2.   Extortion of a Gambling Club
               in the Bronx . . . . . . . . . . . . . . . . 11

          3.   Extortion Conspiracy - Container Seller  . . . 11

          4.   Extortion - Local 6A . . . . . . . . . . . . 12

          5.   Extortion - John Doe #14 . . . . . . . . . . 13

     D.   Loansharking  . . . . . . . . . . . . . . . . . . 13

          1.   Loansharking Conspiracy - John Doe #11 . . . . 13

          2.   Loansharking - John Doe #15 and
               John Doe #17 . . . . . . . . . . . . . . . . 14

          3.   Loansharking Conspiracy - John Doe #19 . . . . 15

          4.   Loansharking - John Doe #20  . . . . . . . . 16

E.  Bribery Scheme . . . . . . . . . . . . . . . . 17

F.  Fraud - MoneyGram . . . . . . . . . . . . . . . 17

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . 18

I.  Legal Standard . . . . . . . . . . . . . . . . . . 18

A.  Bail Reform Act . . . . . . . . . . . . . . . . 18

B.  Organized Crime Defendants . . . . . . . . . . 19

1.  Organized Crime Leaders Are
Dangers to the Community . . . . . . . . . 20

2.  Organized Crime Defendants Are Likely to
Commit Crimes if Released on Bail . . . . . . 24

3.  Elaborate Bail Packages Are Insufficient to
Protect the Community Against
Violent Organized Crime Defendants . . . . . . 25

II.  The Defendants Should Be Detained . . . . . . . . . 27

A.  The Defendants Are a Danger to the Community . . . 27

1.  Nature and Circumstances of the
Crimes Charged . . . . . . . . . . . . . 28

2.  History and Characteristics of
the Defendants . . . . . . . . . . . . . 29

a.  Andrew Russo . . . . . . . . . . . 29

b.  Benjamin Castellazzo . . . . . . . . 31

c.  Richard Fusco . . . . . . . . . . . 31

d.  Dennis Delucia . . . . . . . . . . 32

e.  Reynold Maragni . . . . . . . . . . 32

f.  Anthony Russo . . . . . . . . . . . 32

g.  Daniel Capaldo . . . . . . . . . . 33

h.  Emanuele Favuzza . . . . . . . . . . 34

i.    Joseph Savarese . . . . . . . . . . . . . 34

j.    Ralph Scopo, Jr. . . . . . . . . . . . 35

k.    Ilario Sessa . . . . . . . . . . . . . 35

l.    Michael Castellano . . . . . . . . . 36

m.    Giuseppe Destefano . . . . . . . . . 36

n.    Anthony Durso . . . . . . . . . . . . 37

o.    Scott Fappiano . . . . . . . . . . . 37

3.    Seriousness of Danger Posed by
      the Defendants' Release . . . . . . . . . . 38

4.    Evidence of the Defendants' Guilt . . . . . . 39

B.    The Defendants Constitute a Risk of Flight . . . . 39

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . 41

<u>PRELIMINARY STATEMENT</u>

The government hereby moves for permanent orders of detention with respect to the following defendants, each of whom is a member or associate of the Colombo organized crime family of La Cosa Nostra (the "Colombo family"): Andrew Russo, Benjamin Castellazzo, Richard Fusco, Dennis Delucia, Reynold Maragni, Anthony Russo, Daniel Capaldo, Emanuele Favuzza, Joseph Savarese, Ralph Scopo, Jr., Ilario Sessa, Michael Castellano, Giuseppe Destefano, Anthony Durso and Scott Fappiano.

As further described below, each of these defendants poses a danger to the community and a risk of flight, and should therefore be detained pending trial.[1]

---

[1]    The government makes this motion without prejudice to making additional arguments in support of the detention of any of the defendants whose detention the government seeks in this motion, and without prejudice to seeking a permanent order of detention against other defendants indicted in this or related matters.

1

BACKGROUND

The government proffers the following facts concerning the charges at issue and pretrial detention.[2]  See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (the government is entitled to proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).[3]

The proffer includes a brief description of the following:  (1) the government's investigation of the Colombo family and the defendants; (2) the defendants' association with, and positions in, the Colombo family; and (3) the defendants'

---

[2]    The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

[3]    As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000).  This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

2

involvement in the charged criminal activity, with particular attention to the charged crimes of violence.

I.   Overview of the Investigation

        The Indictment is the most recent result of a long-term investigation by this Office, the Federal Bureau of Investigation and other law enforcement agencies into the ongoing criminal activities of the Colombo family.  The present charges are the product of the government's use of a diverse array of investigative tools, including hundreds of hours of recordings made by cooperating witnesses over the past three years of many of the defendants discussing a variety of criminal activities, including murder.  Notably, these recordings unequivocally make clear that the Colombo family is thriving and continues to engage in various crimes including, among others, robbery, narcotics trafficking, fraud, extortion and loansharking.

II.  The Defendants Are Members or Associates
     of the Colombo Family

        Every one of the charged defendants is a member or associate of La Cosa Nostra ("LCN") -- a violent criminal enterprise responsible for numerous murders.

        A.   The Defendants' Positions in the Colombo Family

        The government will establish the defendants' positions within the Colombo family through consensual recordings, wiretap

3

intercepts[4] and the testimony of cooperating witnesses, as well as surveillance evidence and physical evidence.

As alleged in the Indictment, the defendant Andrew Russo currently serves as the street boss of the Colombo family, Benjamin Castellazzo currently serves as the acting underboss and Richard Fusco currently serves as the consigliere.  Joseph Carna, Dennis Delucia, Reynold Maragni and Anthony Russo hold senior leadership positions as captains or acting captains.  In addition, Daniel Capaldo, Emanuele Favuzza, Vincent Febrraro, John Maggio, Theodore Persico, Jr., Nicky Rizzo, Joseph Savarese and Ralph Scopo, Jr., are "made" members of the Colombo family. With five exceptions, the remainder of the defendants charged in the above-captioned case are associates of the Colombo family.[5]

B.   The Induction Ceremony Scheduled for December 7, 2010

The consensual recordings also make clear that the Colombo family continues to induct new members.  For example, at a secret ceremony in January 2009, defendants Capaldo, Favuzza, Maggio, Anthony Russo and Savarese – along with one other individual – were inducted into the Colombo family.  The Colombo

---

[4]     The government hereby provides the defendants with notice, pursuant to 18 U.S.C. § 2518(9), of the government's intent to rely on wiretap evidence gathered pursuant to court-authorized wiretaps in the prosecution of this matter.

[5]     The defendant Giovanni Galluzzo is a Luchese family associate.  The defendant John Dunn is a Gambino family associate.  The defendant Hector Pagan is a Bonanno family associate.  Vito Vizzi and Joseph Dimarco are LCN associates.

family intended to hold another such ceremony at defendant
Favuzza's residence on December 7, 2010.  Defendant Ilario Sessa
and three others were slated to be inducted into the Colombo
family on that date with the assistance of, among others,
defendants Castellazzo and Anthony Russo.  Much to Sessa's
chagrin, as evidenced on consensual recordings made by a
cooperating witness, the induction ceremony was canceled after
agents of the FBI identified the location where the ceremony was
to be held and conducted surveillance.

          The events leading up to the scheduled ceremony and the
aftermath of its cancellation were vividly captured on consensual
recordings.  In a consensual recording made on December 5, 2010,
Colombo family acting captain Anthony Russo and a cooperating
witness ("CW-1") drove to Sessa's residence, where Anthony Russo
engaged in a private conversation with Sessa.  Following their
private conversation, Anthony Russo and Sessa separately told
CW-1 that the ceremony at which Sessa would be inducted in the
Colombo family would occur that week.  CW-1 also observed Sessa
give Anthony Russo two plastic bags, one of which CW-1 later
learned contained the firearm to be used in Sessa's induction
ceremony.  Anthony Russo and CW-1 then departed Sessa's residence
and traveled to Favuzza's residence, where Anthony Russo dropped
off the firearm.  The following day, Sessa commented to CW-1
about his embarrassment at having to "bring his own" firearm to

his own induction ceremony.   Sessa explained to CW-1 that he had "three of these things . . . [U/I] .357 and a .38."

On the evening of December 6, 2010, the Colombo family canceled the ceremony due to law enforcement surveillance.   In light of the cancellation, Anthony Russo directed Sessa to retrieve the firearm he provided for the ceremony from Favuzza and Castellazzo.   On a consensual recording, Sessa complained:

> What do you think happened, the whole thing's [the ceremony] dead . . .  I had to back and get my thing [the firearm] . . . the whole thing is dead, everybody . . . I don't know, it came from Anthony [Russo] . . . Anthony comes meets me in Brooklyn, says I gotta tell you something . . .  I figure he's gonna tell me what time [i.e., the time of the induction ceremony], find out what time . . . dead hand . . . that things no good go get it . . . pistol, you want a different one? . . . the whole thing's dead, no good . . . it's coming from this guy [Andrew Russo] . . . who he met . . . mumbling something about this guy . . . I don't know . . . [Anthony] makes me go all the way back to the place [Favuzza's residence] to get the pistol . . .  I didn't want to start . . . I got three felonies too . . . I went back there, took care of that . . . didn't say it [the ceremony] was postponed or anything, said it's dead . . . didn't say postponed or dead said go back and get the gun . . . I said what's happening . . . this guy [Andrew Russo] shut it down, closed down or stopped it completely.

To date, Sessa and the other men proposed for induction at the December 2010 ceremony have not been inducted into the Colombo family.

III. <u>The Defendants Are Charged With Crimes of Violence</u>

 With the exception of Michael Castellano, each of the defendants for whom the government seeks pretrial detention is charged with one or more crimes of violence.  The following are brief summaries of the facts underlying some of the charges against these defendants.

 A.  <u>Murder of Joseph Scopo</u>

 As alleged in Count One (Racketeering Act One) of the Indictment, the defendant Anthony Russo is responsible for the 1993 murder of Joseph Scopo.[6]  Joseph Scopo was murdered as he got out of the passenger seat of a vehicle parked in front of his residence in Ozone Park, Queens on October 20, 1993.  Scopo was killed in connection with the Colombo family war, during which the Colombo family split into two feuding factions, one loyal to Victor "Vic" Orena and the other loyal to Carmine "the Snake" Persico.  Joseph Scopo, who at the time of his murder was the underboss of the Colombo family and affiliated with the Orena faction, was the final Colombo family war casualty.

 On multiple consensual recordings, Anthony Russo admitted his participation in the Scopo murder.  For example, in one recording, Anthony Russo explained to a cooperating witness,

---

[6]  In November 1999, Colombo family associate John Pappa was convicted, after trial, of the Scopo murder.

CW-1, that he was in a nearby vehicle while Colombo family associate John Pappa fatally shot Joseph Scopo:

Anthony Russo: I had my hat on.  Hat flew off.  I ain't kidding.  And my side window [U/I]

CW-1: [U/I]

Anthony Russo: It came off.  It came off.  BF was in the backseat.  He said, "What the fuck?"  Are you crazy!  I jumped out of the car.  I was like a fuckin' mad hatter.  I didn't know what to do.  I started beep, beep, beep, beep.

CW-1: What was [U/I] doing?

Anthony Russo: Guy's up the block.  I emptied out.  You know what it is, the fucking?  From behind?

CW-1: I got shot.

Anthony Russo: Do you know what it is to get it from behind.

Anthony Russo: He [BF] was laughing hysterical in the back.  You ever see a friend laughing? [Laughing]

CW-1: Yeah, cause his hat didn't come off.

Anthony Russo: No, cause he [BF] was in the car behind.

B.  <u>Robbery - Staten Island Residence</u>

As alleged in Count One (Racketeering Act Thirty-Three), Count Two (Racketeering Act Fifteen) and Count Forty of the Indictment, the defendants Scott Fappiano, Anthony Russo and

8

Joseph Savarese conspired to commit a violent home-invasion robbery of a legitimate businessman who was rumored to have $25 million in cash in his residence.  Fappiano advised CW-1 about the potential "score" and asked CW-1 if he wanted to participate. When Savarese learned of the scheme, Savarese told another cooperating witness ("CW-2") that he had two handguns, a .38 caliber and a .45 caliber, and could get "bigger shit" if needed. Savarese later advised that he also had bulletproof vests that they could use.  Anthony Russo later suggested that they use a "bogus" license plate to avoid detection by law enforcement.

     C.  <u>Extortion</u>

        1.  <u>Conspiracy to Extort the Gambino Family</u>

As alleged in Count One (Racketeering Act Thirty-Four), Count Two (Racketeering Act Sixteen) and Count Forty-One, the defendants Andrew Russo, Castellazzo, Delucia, Fusco and Anthony Russo conspired to extort members and associates of the Gambino family of money to pay for medical care and other expenses incurred by Colombo family associate Walter Samperi.  On May 16, 2010, Samperi was stabbed by an individual affiliated with the Gambino family.  To compensate, members of the Colombo family initiated a formal dispute, or "beef," with a member of the ruling panel of the Gambino family.

After a series of meetings, or "sit-downs," with members of the Gambino family, the Colombo family administration

members and the New York City-based captains met at a residence in Staten Island, where they discussed, among other things, the dispute over Samperi.  The meeting was captured in a consensually-made recording.  Andrew Russo, as the street boss of the Colombo family, presided over the meeting.  At the outset, Andrew Russo admonished Anthony Russo and the others present that they should not attend a sit-down with another LCN family without first alerting the Colombo family administration.  With respect to the stabbing of Samperi, Andrew Russo observed that they should have first "g[o]t even" and then initiated discussions with the Gambino family.

The administration and the captains then discussed a variety of ways to obtain compensation for Samperi.  They ultimately agreed that, in exchange for their promise not to retaliate, the Colombo family would require the Gambino family to make a one-time payment of $150,000, $100,000 of which was to come from the Gambino family's "basket" from the "feast," a reference to an annual Italian feast held in late August on 18th Avenue in Brooklyn, the Figli di Santa Rosalia.[7]

---

[7]     Consensual recordings made during the course of the investigation demonstrate that the Colombo family has controlled the Figli di Santa Rosalia for several years.

    2.   <u>Extortion of a Gambling Club in the Bronx</u>

As alleged in Count Two (Racketeering Act Five) of the Indictment, the defendants Delucia and Sessa, as well as Colombo family associate "Phil," who like Sessa was proposed to be inducted in the Colombo family, extorted a gambling club located in the Bronx.  On a consensual recording, Sessa explained to CW-1 that Delucia had directed Sessa and Phil to go to a card club in the Bronx and to instruct the owners and operators of the card club that they could not operate their illegal card game such that it competed with Delucia's card game.  Sessa explained that they went to the card club, wielding baseball bats and with Sessa carrying a gun.

    3.   <u>Extortion Conspiracy - Container Seller</u>

As alleged in Count Two (Racketeering Act Six) of the Indictment, the defendant Joseph Savarese is charged with attempting to extort the right to receive payment for the sale of containers.  Specifically, Savarese pistol-whipped an individual who sought payment on a set of containers that had been delivered to an associate of Savarese.  On a consensual recording, Savarese explained that he assisted an individual who had purchased a "hundred-something containers," but refused to pay the agreed-upon price for the containers.  Savarese admitted that, after the seller tried to collect "his money" from the individual, Savarese pistol-whipped the seller.  Savarese explained that he later

heard through organized crime channels that the seller wanted to meet with Savarese, but Savarese refused to meet regarding the dispute unless a "friend," or an inducted member of LCN, reached out to Savarese.

       4.   Extortion - Local 6A

As alleged in Count Two (Racketeering Act One), Count Three and Count Four of the Indictment, the defendant Ralph Scopo, Jr. ("Scopo"), extorted members of the Laborers' International Union of North America ("LIUNA"), Local 6A, through his control of Local 6A and the construction companies at whose sites Local 6A members work.  Historically, the Colombo family -- and more specifically the Scopo family -- has controlled the election of officers and delegates, and the awarding of LIUNA membership cards for friends, family and criminal associates of the Colombo family notwithstanding a lack of qualifications or completion of an apprenticeship program.  As alleged in Count Two (Racketeering Act Two), Count Five and Count Six of the Indictment, Scopo also profited from his control of Local 6A by extorting those who obtained "coffee boy" positions, that is, the individuals who sold coffee and snacks to the union members.  In exchange for the position, the coffee boy had to provide half of the profits from his total sales to Scopo.

    5.    Extortion - John Doe #14

        As alleged in Count One (Racketeering Act Thirty-Seven)

and Count Two (Racketeering Act Eighteen) of the Indictment, the

defendants Anthony Russo, Joseph Savarese and Giuseppe Destefano

extorted John Doe #14 to prevent him from keeping open a gambling

club that Russo and Savarese deemed too close to their gambling

clubs.  Before the assault, Russo commented, "I don't care if we

have to hunt him all night. . . .  Crack him in the fucking mouth

and give him a beat down."  Thereafter, Anthony Russo, Savarese

and Destefano assaulted John Doe #14.  Subsequently, in

anticipation of retaliation by John Doe #14, the following Friday

(the next day John Doe #14 was scheduled to hold a competing card

games), Anthony Russo proposed: "Get everybody loaded up.  They

come in, we shoot the shit out of them."

    D.    Loansharking

        1.    Loansharking Conspiracy - John Doe #11

        As alleged in Count One (Racketeering Act Thirty-Two),

Count Two (Racketeering Act Thirteen) and Count Thirty-Eight of

the Indictment, the defendants Scott Fappiano and Reynold Maragni

conspired to use extortionate means to collect a debt owed by

John Doe #11.  On a consensual recording made by CW-1 in March

2010, Fappiano explained:

            I might need you . . . if I do it I'll go to
            jail . . . spoke to Reynold [Maragni] . . .
            I want to be diplomatic . . . it gets to the
            point where he may have to get his fucking

                            13

> leg broken . . . I'll make sure I'm in court
> somewhere or doing a deposition . . . the
> last time I was in Punta Cana when they went
> to get him, he called the cops . . . he seen
> him coming.

Fappiano later provided CW-1 with a slip of yellow paper that listed the debtor's name, business address, mother's address and other identifying information so that CW-1 could locate, assault and collect gambling losses owed by John Doe #11.

> 2.   <u>Loansharking - John Doe #15 and John Doe #17</u>

As alleged in Count One (Racketeering Acts Thirty-Nine and Forty-One), Count Two (Racketeering Acts Twenty-Two and Twenty-Four), Count Forty-Seven, Count Forty-Eight, Count Fifty and Count Fifty-One of the Indictment, the defendants Anthony Durso, Giovanni Galluzzo, Anthony Russo and Ilario Sessa variously used extortionate means to attempt to collect debts owed by John Doe #15 and John Doe #17.  On a consensual recording, Anthony Russo mentioned that he had received a message from an incarcerated Colombo family soldier, who asked for Russo's assistance in collecting outstanding loanshark debts, including debts owed by John Doe #15 and John Doe #17.  Anthony Russo explained that, at his direction, Sessa and Durso, while Galluzzo stood guard, assaulted John Doe #15 when he claimed not have the money.  Sessa stated that at one point during the assault, he held a knife to the face of John Doe #15.  Also at the direction of Anthony Russo, Sessa confronted John Doe #17 in

an attempt to collect a debt he owed.  Sessa later observed to CW-1 that he would put John Doe #17 "in the hospital."

      3.    <u>Loansharking Conspiracy - John Doe #19</u>

As alleged in Count One (Racketeering Act Forty-Three), Count Two (Racketeering Act Twenty-Seven) and Count Fifty-Five of the Indictment, the defendants Reynold Maragni and Anthony Russo conspired to use extortionate means to collect a debt owed by John Doe #19.  On a consensual recording, Maragni explained to CW-1:

| | |
|---|---|
| MARAGNI: | We're gonna grab someone when I come up.  This kid Vincent.  He's got a surveying company.  When we had the conversation, everything this kid.  <u>We're gonna kick the shit out of him.</u> |
| MARAGNI: | I'll talk to Anthony [Russo] when I come up. |
| CW-1: | You mean about your situation. |
| MARAGNI: | There was a settlement.  I settled for 20.  They were supposed to live up to his end of the bargain.  13.  Supposed to give me the other seven.  Time share thing.  400 per month.  I told him two days, I spoke to you, he gave you me word.  Now I don't want to talk to you any more.  Now I want the whole 40.  The time share, I want the whole fuckin' thing.  That's another $25,000.  Either you give me the money.  I'm gonna abuse Stevie Mad Dog.  I want to be <u>introduced</u> to him. |

15

In a subsequent consensual recording, Maragni provided CW-1 with additional identifying information for John Doe #19 and asked CW-1 to threaten this individual and tell him he better start paying his debt.  Therafter, CW-1 told Anthony Russo about Maragni's request, and Anthony Russo agreed to pursue the matter.

        4.   <u>Loansharking - John Doe #20</u>

As alleged in Count Two (Racketeering Act Seven) of the Indictment, the defendants Dennis Delucia and Joseph Savarese used extortionate means to collect a debt owed by John Doe #20. Savarese admitted his participation in a consensual recording:

> But in the summertime, we came an agreement
> with this cocksucker, I Louis Ganoli.  I beat
> him up over here, like, last year.  I was
> pounding him for the money, talking to him a
> couple times.  I sent for him a couple of
> times.  He came over here to meet me.  Larry
> [Sessa] was just pulling up and got out of
> the car.  We gave him a beating right there.
> Larry jumped out of the car, we both beat him
> up.  Then he left.  Then the son got in
> touch.  The son told me that I don't want my
> father to get hurt again, I wanna pay.  I
> said, alright.  I told him to pay, that's the
> only way he's not going to get hurt again.
> The figure was 13,000.  They had a guy from
> the West side, a goodfellow from the West
> side.  Reached out to Dennis [Delucia].  Told
> Dennis that he wanted to straighten it out.
> Told the kid Dennis, will you take 8,000.
> Dennis said yeah.  He says, alright; he gave
> the money to Dennis.  Dennis gave the money
> to me.  And I gave the money to Christina.
> That's the only money that.  I never sent
> money to the account.

E.    Bribery Scheme

As alleged in Count Two (Racketeering Act Fourteen) and Count Thirty-Nine of the Indictment, the defendant Reynold Maragni engaged in a scheme to attempt to bribe a public servant in the State of Florida to cause the commutation of the sentence of a relative of a cooperating witness who had been sentenced to a lengthy term of imprisonment.  On a consensual recording, Maragni explained that the amount of the bribe "could be anywhere from 25 to 50," and later added that his contact "m[ight] turn around and tell me 100."  Maragni vowed, "I'm gonna do everything I can, to let him agree to take as least amount as I can."

In September 2010, CW-1 traveled to Florida to meet with Maragni, who told CW-1 that during the previous day, Maragni had met his contact, whom he described as a lawyer, for three hours.  Maragni said that his contact asked for $80,000 to $85,000 to help CW-1's relative.  Maragni later told CW-2 that the agreed-upon bribe was $80,000, to be paid in three installments.

In November 2010, on behalf of CW-1, CW-2 provided $25,000 to Maragni, representing the first of three planned payments.  However, when Maragni subsequently advised CW-1 that he would not deliver the bribe money to his contact for several weeks, CW-1 requested that Maragni return the money, and Maragni agreed.  In furtherance of the bribery scheme, Maragni traveled

17

between Florida and New York and New Jersey, in addition to using facilities in interstate commerce.

  F. <u>Fraud - MoneyGram</u>

    As alleged in Count One (Racketeering Acts Fifteen to Eighteen) and Counts Ten to Fourteen of the Indictment, the defendants Michael Castellano and John Rossano engaged in a scheme to defraud MoneyGram of more than $1.5 million.  To effectuate the scheme, Castellano placed numerous calls to MoneyGram, posing as employees of MoneyGram outlets, to arrange for the transmission of MoneyGram money orders.  In each of the calls, Castellano provided the outlet's pin number.  Rossano and Castellano, together with others, then traveled to MoneyGram outlets in various states to collect these money orders.  To pick up the orders, the coconspirators presented fraudulent identification documents.

<u>DISCUSSION</u>

I. <u>Legal Standard</u>

  A. <u>Bail Reform Act</u>

    Under the Bail Reform Act, 18 U.S.C. § 3141 <u>et</u> <u>seq</u>., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  <u>See</u> 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and

18

the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. See Ferranti, 66 F.3d at 542; United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g).

B.   Organized Crime Defendants

Courts in this circuit have routinely faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses. See, e.g., United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312

F.3d 535, 543 (2d Cir. 2002); <u>United States v. Agnello</u>, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); <u>United States v. Defede</u>, 7 F. Supp. 2d 390, 395-96 (S.D.N.Y. 1998) (Luchese family acting boss Joseph Defede detained as danger to the community); <u>United States v. Salerno</u>, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community), <u>order vacated</u>, 794 F.2d 64 (2d Cir.), <u>order reinstated</u>, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand, at the very least, for the following propositions: (1) leaders of a violent organized criminal enterprise are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (3) elaborate bail packages involving home detention and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

1. Organized Crime Leaders Are
   <u>Dangers to the Community</u>

Pretrial detention is warranted where defendants, charged with violent crimes, are leaders or high-ranking members of a criminal organization whose activities routinely include violence and threats of violence. <u>See</u> <u>Ciccone</u>, 312 F.3d at 543; <u>United States v. Colombo</u>, 777 F.2d 96, 99-100 (2d Cir. 1985);

20

United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996).  Courts in this circuit have recognized that when organized crime depends on a pattern of violent conduct of the sort charged in this case, the risk to the community is substantial and justifies detention.

     For example, in Defede, Joseph Defede was charged with extortion and extortion conspiracy.  The district court ordered Defede's pretrial detention, finding that the government had shown by clear and convincing evidence that Defede was the acting boss of the Luchese family, thus rendering him a danger to public safety:  "The acting boss of the Luchese family supervises all of its far-flung criminal activities, including acts of violence. Defede's continued liberty therefore presents a substantial danger to the public . . . ."  Defede, 7 F. Supp. 2d at 395.

     More recently, a court in this District denied bail to the acting boss of the Genovese family who "participated at the highest levels in directing an organization alleged in the indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," Cirillo, slip. op. at 7, as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," id. at 11.  The Second Circuit affirmed those findings by summary order.

21

See 149 Fed. Appx. at 43 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only from their own violent activities but from those of subordinates whom they supervise.") (citing Ciccone, 312 F.3d at 543).

In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization.  Ciccone, 312 F.3d at 542-43; see also Ferranti, 66 F.3d at 543 (noting that the defendant need not have committed the violence himself; he can be deemed dangerous if he directed others to commit acts of violence) (citing Colombo, 777 F.2d at 98).  As one court has pointed out, an organized crime leader "is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release." Gotti, 219 F. Supp. 2d at 299-300 (citations omitted).

To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence

22

as a result of their position in a criminal enterprise.  As the

court held in <u>Defede</u>:

> [I]t is well established that persons who
> hold Defede's status routinely engage in
> conduct that is a menace to public safety.
> The argument thus is based not on the status,
> but on the inference that a person in
> Defede's position is quite likely to engage
> in dangerous conduct – just as one reasonably
> could infer that one holding the position of
> major league baseball pitcher is entirely
> likely to hurl a small white object in the
> direction of home plate.

7 F. Supp. 2d at 392 n.4.

Moreover, in enacting the Bail Reform Act, Congress

recognized that certain defendants, such as high-ranking members

of an organized crime family fall within a "'small but

identifiable group of particularly dangerous defendants as to

whom neither the imposition of stringent release conditions nor

the prospect of revocation of release can reasonably assure the

safety of the community.'"  <u>Colombo</u>, 777 F.2d at 99 (quoting S.

Rep. No. 225 98th Cong., 1st Sess. at 6-7, <u>as</u> <u>reprinted</u> <u>in</u> 1984

U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3188-89).

Nor is the above caselaw narrowly limited to organized

crime "bosses" or "acting bosses."  In <u>Salerno</u>, 631 F. Supp. at

1374-75, the court held that a defendant would be a danger to the

community if released on bail based on evidence that he was a

captain in an organized crime family who managed the enforcement

operations of the enterprise.  Likewise, in <u>Colombo</u>, a captain of

a crew in the Colombo family was ordered detained because the operation of that organization posed a risk to the public and a danger to the community by its "consistent pattern of orchestrating a series of violent criminal operations."  777 F.2d at 99-100 (internal quotation marks omitted).

       2.    Organized Crime Defendants Are Likely
              to Commit Crimes if Released on Bail

Organized crime defendants also pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities.  At bottom, because organized crime defendants are career criminals who belong to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail.  See Salerno, 631 F. Supp. at 1375 (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual).

In addition, defendants pose a danger to the community not only when they commit acts of violence, but when it is likely that they will commit even non-violent crimes that are detrimental to the community.  See Senate Report at 3195 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . .  The Committee intends that the concern about safety be given a broader construction

24

than merely danger of harm involving physical violence.").  In
Colombo, the court held "[i]n light of Congress' direction that
'[w]here there is a strong probability that a person will commit
additional crimes if released, the need to protect the community
becomes sufficiently compelling that detention is, on balance,
appropriate.'"  777 F.2d at 99 (quoting Senate Report at 3189).
In Salerno, the court upheld the detention of two leaders of the
Genovese organized crime family, noting:

> The activities of a criminal organization
> such as the Genovese Family do not cease with
> the arrest of its principals and their
> release on even the most stringent of bail
> conditions.  The illegal businesses, in place
> for many years, require constant attention
> and protection, or they will fail.  Under
> these circumstances, this court recognizes a
> strong incentive on the part of its
> leadership to continue business as usual.
> When business as usual involves threats,
> beatings, and murder, the present danger such
> people pose in the community is self evident.

631 F. Supp. at 1375.

> 3.    Elaborate Bail Packages Are Insufficient to
>       Protect the Community Against Violent
>       Organized Crime Defendants

Finally, the Second Circuit repeatedly has rejected
"elaborate" bail packages for dangerous defendants, including
leaders of organized crime families shown to be involved in
violent criminal activities.  See United States v. Dono, Nos. 07-
5333-cr(L), 07-5334-cr(CON), 275 Fed. Appx. 35, 2008 WL 1813237,
at *2-3 (2d Cir. Apr. 23, 2008) (rejecting conditions that

included, among others, home detention and electronic monitoring, and a requirement that the defendant's father – a retired police officer – take "personal responsibility" for the defendant); Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); Colombo, 777 F.2d at 97, 100 (rejecting, among other conditions of release, $500,000 bail secured by real property).

The Second Circuit has viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals.  In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills.  If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (internal citations and quotation marks omitted).  See also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal citation and quotation marks omitted).

26

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  <u>See</u>, <u>e.g.</u>, <u>Dono</u>, 2008 WL 1813237, at *2-3 (noting that the idea that "'specified conditions of bail protect the public more than detention is flawed'") (quoting <u>Orena</u>, 986 F.2d at 632); <u>United States v. Cantarella</u>, No. 02-CR-307 (NGG), 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); <u>Agnello</u>, 101 F. Supp. 2d at 116 (Gershon, J.) ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); <u>United States v. Masotto</u>, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

27

II.   <u>The Defendants Should Be Detained</u>

     A.   <u>The Defendants Are a Danger to the Community</u>

          Defendants Andrew Russo, Castellazzo, Fusco, Delucia, Maragni, Anthony Russo, Capaldo, Favuzza, Savarese, Scopo, Sessa, Castellano, Destefano, Fappiano and Durso pose a substantial danger to the community.  Each defendant is affiliated with a violent criminal enterprise and, with the exception of Castellano, has engaged in violence, planned violence, possessed firearms for the purpose of engaging in violence, or threatened violence.  As discussed more specifically below, each of the relevant considerations under the Bail Reform Act strongly favors detention here.

        1.   <u>Nature and Circumstances of the Crimes Charged</u>

          First, with the exception of Castellano, each of the defendants for whom the government seeks detention is charged with crimes of violence under the relevant provisions of the Bail Reform Act.  <u>See</u> <u>Ciccone</u>, 312 F.3d at 542 (citing 18 U.S.C. §§ 3156(a)(4)(A), (B)) (Bail Reform Act defines a "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"); <u>Chimurenga</u>, 760

F.2d at 404 (conspiracy to commit a crime of violence is a crime of violence for purposes of the Bail Reform Act).

Furthermore, one of the charges against Castellazzo, Favuzza, Anthony Russo, Savarese and Sessa – possession of a firearm in furtherance of racketeering conspiracy (Counts Thirty, Fifty-Nine and Sixty)[8] – carries a statutory presumption against bail. See 18 U.S.C. § 3142(e). The rebuttable presumption shifts the burden of production to the defendant. See Martir, 782 F.2d at 1144. Moreover, even if the defendant satisfies this burden, the court should continue to give some weight to the presumption, "keeping in mind that Congress has found that these offenders pose special risks" and that "a strong probability arises that no form of conditional release" will adequately protect the community. Id. (applying standard with regard to the presumption of flight) (citation and internal quotation marks omitted).

> 2. History and Characteristics of the Defendants

The defendants' history and characteristics also clearly favor detention.

---

[8]     The Second Circuit has held that "where the government proves (1) the commission of at least two acts of racketeering and (2) at least two of those acts qualify as 'crime[s] of violence' under [18 U.S.C.] § 924(c), a [18 U.S.C.] § 1962 conviction serves as a predicate for a conviction under § 924(c)." United States v. Ivezaj, 568 F.3d 88, 96 (2d Cir. 2009).

a.   <u>Andrew Russo</u>

As noted above, defendant Andrew Russo is currently the street boss of the Colombo family, a violent criminal enterprise, and is charged with, among other crimes, racketeering conspiracy, including extortion conspiracy and loansharking as predicate acts, which constitutes a crime of violence.  Notably, in his capacity as the street boss of the Colombo family, Andrew Russo has required Colombo family members to obtain approval from the Colombo family administration regarding all decisions involving the affairs of the Colombo family.  Furthermore, Andrew Russo has numerous capable individuals to carry out violent crimes at his direction.  For example, on one consensual recording, Anthony Russo, one of Andrew Russo's most reliable captains, said:

> Anthony Russo: I haven't been anywhere. Every time I turn around, there's a problem I gotta handle.  Why do I have to handle?
>
> CW-1:         Why do you gotta go all the time?
>
> Anthony Russo: I don't know, the guy [Andrew Russo] wants me to go.   I'm gonna go to jail.

Anthony Russo also explained the requirements set by Andrew Russo to become an inducted member of the Colombo family: "First, he's gotta be capable in here [<u>i.e.</u>, his head].  And he's gotta be capable to do this [<u>i.e.</u>, murder].  They gotta be capable to do time [<u>i.e.</u>, jail time].  They gotta be capable of everything."

Moreover, Andrew Russo has made clear that he will not hesitate to personally engage in violence.  For example, on one consensual recording, Andrew Russo commented, "I don't hesitate, I've never hesitated" to hurt an individual if the individual stepped out of line.  He has also made clear that he has no intention of disassociating himself from the Colombo family or La Cosa Nostra.  He stated, "I can't walk away . . . .  I can't rest."

In addition, Andrew Russo has prior convictions for various felony offenses, including bribery, witness tampering and racketeering.  Notably, Andrew Russo was released from a term of supervised release on or about March 22, 2010, and was shortly thereafter appointed as the street boss of the Colombo family.

b.   Benjamin Castellazzo

Defendant Castellazzo currently holds the position of the acting underboss of the Colombo family, is charged with extortion, loansharking, and possession of a firearm, all crimes of violence.  Additionally, Castellazzo has prior convictions for, among other crimes, extortion and loansharking.

c.   Richard Fusco

Defendant Fusco currently holds the position of the consigliere of the Colombo family.  He is charged with extortion conspiracy, which constitutes a crime of violence.  Fusco has prior convictions for racketeering and fraud.

31

d.   <u>Dennis Delucia</u>

Defendant Delucia is a captain in the Colombo family. He is charged with extortion and extortion conspiracy, which constitute crimes of violence.  He has prior convictions for, among other crimes, extortion and extortion conspiracy.

e.   <u>Reynold Maragni</u>

Defendant Maragni is a captain in the Colombo family. He is charged with extortion and multiple conspiracies to use extortionate means to collect extensions of credit, which constitute crimes of violence.  In addition, Maragni is charged with money laundering, a bribery scheme and a conspiracy to distribute narcotics.  In addition to the crimes set forth above where Maragni has solicited coconspirators to engage in acts of violence, Maragni asked CW-1 to assault an individual who disrespected a relative of the official underboss Genarro Langella.  Specifically, Maragni asked CW-1 to threaten an individual with bodily harm if the individual further disrespected the relative.

Maragni also has a prior felony conviction for racketeering.

f.   <u>Anthony Russo</u>

In January 2009, while Anthony Russo was serving a term of supervised release, he was inducted into the Colombo family and was promoted to acting captain in June 2010.  He is charged

with murder, extortion, extortion conspiracy, loansharking, loansharking conspiracy and firearms possession, which constitute crimes of violence.  Indeed, on one consensual recording, Anthony Russo told CW-1 that he was carrying "a pistol."

As noted above, Anthony Russo is captured discussing his threats and acts of violence during numerous recorded conversations.  In addition, Anthony Russo has made numerous other comments, captured on consensual recordings, evidencing his willingness to commit violence.  He once stated to CW-1 that they were "the only guys willing to go to war."  On another occasion, he threatened that he was going to hit a debtor in the head with a pipe.

On consensual recordings, Anthony Russo has also made clear the harm he would inflict on any individuals determined to be cooperating witnesses.  For example, on a consensual recording made by CW-1 in December 2010, Anthony Russo observed that there was a "rat real close to us" and stated that he wanted to find the individual and "chop his head off."

Anthony Russo has a prior conviction for racketeering conspiracy.

g.   <u>Daniel Capaldo</u>

In January 2009, while Capaldo was serving a term of supervised release, Capaldo was inducted into the Colombo family. Capaldo is charged with loansharking offenses, which are crimes

33

of violence.  Notably, he committed at least one of the crimes
charged while he was serving a term of supervised release.  In
addition, Capaldo recently pleaded guilty to racketeering
conspiracy in connection with conduct he committed while on
supervised release.

        h.   <u>Emanuele Favuzza</u>

     In January 2009, Favuzza was inducted into the Colombo
family.  Favuzza is charged with racketeering conspiracy,
including loansharking offenses as predicate acts, and firearms
possession in connection with racketeering conspiracy.  Notably,
Favuzza committed one of the charged crimes while he was serving
a term of probation.

        i.   <u>Joseph Savarese</u>

     Joseph Savarese was inducted into the Colombo family in
January 2009, while he was serving a federal sentence in a
halfway house.  Savarese also admitted to CW-1, during a
consensually-recorded conversation, that he had wanted to
participate in a robbery while he was in the halfway house, but
could not in light of his curfew:[9]

> When I was in the halfway house, Gaspar
> [Marciante] came to meet me at the Post
> [where Savarese was employed], telling me,
> "Me [Marciante] and Carmine [Carini] are
> going to do a fuckin' score tomorrow if you

---

[9]    The individuals who asked Savarese to participate were
later charged in the Eastern District of New York with a series
of robberies.

wanna come." I said, "I'm in the halfway
house. I can't leave. How am I gonna get
out?" . . . I wanted to go.

Savarese is charged with, among other crimes,
racketeering conspiracy, including robbery conspiracy, extortion,
loansharking and narcotics distribution as predicate acts, as
well as brandishing a firearm. Savarese has a prior conviction
for racketeering conspiracy in connection with Savarese's
participation in the Colombo family war, and is currently serving
a term of supervised release. Notably, Savarese committed all of
the charged crimes while he was serving a term of supervised
release.

### j.   Ralph Scopo, Jr.

Ralph Scopo, Jr., is an inducted member of the Colombo
family and has a history of corruptly influencing the affairs of
Local 6A (the very union he is charged with extorting). Scopo
also has a lengthy criminal history, including a 2006 conviction
for making an extortionate extension of credit, for which he
received a sentence of time served and a three-year term of
supervised release. Notably, Scopo committed the charged
racketeering conspiracy while he was serving this term of
supervised release.

### k.   Ilario Sessa

Sessa is a long-time associate of the Colombo family
and as detailed above was scheduled to become an inducted member

of the family in December 2010.  Sessa is charged with racketeering conspiracy, including extortion and loansharking as predicate acts, and possession of a firearm in connection with racketeering conspiracy.  In a consensual recording made in December 2010, Sessa advised Anthony Russo and CW-1 that he "always" carried a knife.

As Sessa has admitted in consensual recordings, he has two prior felony convictions, both of which relate to his affiliation with the Colombo family.  In December 2008, Sessa was arrested for a violation of supervised release, to which he later pleaded guilty.  After serving a five-month term of incarceration, Sessa was released in July 2009 and quickly resumed committing crimes in connection with the Colombo family in the hopes of fulfilling his well-known goal of becoming a soldier in the Colombo family.

l.   Michael Castellano

Castellano is an associate of the Colombo family. Castellano is charged with racketeering conspiracy, including fraud as predicate acts, and multiple counts of fraud.  Notably, Castellano has a previous conviction for fraud.  While Castellano was released on bail in connection with his previous arrest, Castellano committed another act of fraud.

36

m.  <u>Giuseppe Destefano</u>

Destefano is an associate of the Colombo family. Destefano is charged with, among other crimes, racketeering conspiracy, including extortion and loansharking as predicate acts, and possession of a firearm after having been convicted of a felony.  Destefano has a prior felony conviction for loansharking.

n.  <u>Anthony Durso</u>

Anthony Durso is an associate of the Colombo family. Durso is charged with participating in loansharking, a crime of violence.  In the charged offense, Durso and Sessa, with the aid of a knife, assaulted a loanshark victim.

Sessa has described Durso as his most trusted associate and has noted that Colombo family member Savarese "loves" Durso. Among other criminal errands, Durso drove Sessa to a meeting with Favuzza and Castellazzo to retrieve the firearm that was to be used in Sessa's induction ceremony and maintained possession of the firearm.

o.  <u>Scott Fappiano</u>

Fappiano is an associate of the Colombo family.  He is has a prior felony conviction for reckless endangerment and is currently serving a term of probation.  Fappiano is charged with, among other crimes, racketeering conspiracy, including a robbery conspiracy and loansharking as predicate acts.  Notably, he

37

committed the charged crimes while serving a term of probation. In a consensual-recorded conversation, Fappiano also admitted that he gave tips about potential robbery targets to a crew of individuals committing home invasions.  He further admitted that he had stored some of the tools used in those robberies, but destroyed the evidence after those individuals were arrested.

### 3.    Seriousness of Danger Posed by the Defendants' Release

The seriousness of the danger posed by the defendants' release cannot be underestimated in light of their affiliation with the Colombo family, a violent criminal enterprise, and their involvement in crimes of violence and/or possession of weapons. As noted above, courts in this circuit have recognized that when organized crime defendants, such as the defendants in this case, are charged with employing violent conduct, the risk of continued violent conduct is substantial and justifies detention.  See Salerno, 631 F. Supp. at 1364.

Moreover, a defendant poses a danger to the community not only when he commits acts of violence, but when he is likely to commit non-violent crimes that harm the community.  Here, beyond the crimes of violence described above, several of the defendants are charged with engaging in other crimes that are a detriment to the community, including narcotics distribution.  In addition, many of the defendants are charged with crimes that they committed while serving another sentence, or while on

38

supervised release, amply demonstrating their disregard for court orders and a high risk that they will continue to commit crimes if released pending trial.

    4.  <u>Evidence of the Defendants' Guilt</u>

As discussed above, the evidence of the defendants' guilt is exceedingly strong. The government intends to prove the defendants' guilt at trial through the testimony of numerous witnesses, including cooperating witnesses, many of whom were once the defendants' co-conspirators. In addition, the defendants were intercepted on wiretaps and hundreds of hours of consensual recordings discussing charged crimes. Physical and documentary evidence, such as phone records, and surveillance evidence underscore the defendants' guilt.

*    *    *

In sum, in considering each of four relevant "detention" factors, the aforementioned defendants are a danger to the community and should be detained.

    B.  <u>The Defendants Constitute a Risk of Flight</u>

The aforementioned defendants also constitute a risk of flight. On the current charges, each defendant faces significant jail time, as detailed below:

| | |
|---|---|
| Andrew Russo: | Up to 60 years' imprisonment |
| Daniel Capaldo: | Up to 100 years' imprisonment |
| Michael Castellano: | Up to 120 years' imprisonment |

39

| | |
|---|---|
| Benjamin Castellazzo: | Up to life imprisonment |
| Dennis Delucia: | Up to 45 years' imprisonment |
| Giuseppe Destefano: | Up to 110 years' imprisonment |
| Anthony Durso: | Up to 40 years' imprisonment |
| Scott Fappiano: | Up to 60 years' imprisonment |
| Emanuele Favuzza: | Up to life imprisonment |
| Richard Fusco: | Up to 20 years' imprisonment |
| Reynold Maragni: | Up to 115 years' imprisonment |
| Anthony Russo: | Up to life imprisonment |
| Joseph Savarese: | Up to life imprisonment |
| Ralph Scopo, Jr.: | Up to 100 years' imprisonment |
| Ilario Sessa: | Up to life imprisonment |

The significant sentences faced by these defendants give them a substantial incentive to flee. See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight). In addition, defendants Andrew Russo, Capaldo, Castellano, Castellazzo, Delucia, Destefano, Fappiano, Favuzza, Fusco, Maragni, Anthony Russo, Savarese, Scopo and Sessa have also maintained their membership in or association with the Colombo family while serving terms of probation or supervised release. Furthermore, the defendants Capaldo, Fappiano, Favuzza, Savarese, Scopo and Sessa also committed the charged crimes while serving terms of probation or supervised release.

Moreover, defendant Castellano has a history of committing offense involving dishonesty, including the use of false identification documents.  He thus cannot be trusted to abide by release conditions.  See United States v. Hollender, 162 F. Supp. 2d 261, 265-66 (S.D.N.Y. 2001) (a defendant's ability to flee, in light of involvement in "crimes the nature of which involve deception . . . [and] that those deceptions are alleged to have included the use of false and fictitious identities," supported a finding that the defendant was a flight risk).

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the Court enter permanent orders of detention with respect to defendants Andrew Russo, Benjamin Castellazzo, Richard Fusco, Dennis Delucia, Reynold Maragni, Anthony Russo, Daniel Capaldo, Emanuele Favuzza, Joseph Savarese,

41

Ralph Scopo, Jr., Ilario Sessa, Michael Castellano, Giuseppe

Destefano, Anthony Durso and Scott Fappiano.


Dated:      Brooklyn, New York
            January 20, 2011

                                    Respectfully submitted,

                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York  11201

Elizabeth A. Geddes
James D. Gatta
Allon Lifshitz
Assistant United States Attorneys
      (Of Counsel)