1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                        :
4    UNITED STATES OF AMERICA,          :
                                        :   11-CR-00030
5                                       :
                                        :
6              v.                       :
                                        :   225 Cadman Plaza East
7    ANDREW RUSSO, *et al.,*            :   Brooklyn, New York
                                        :
8              Defendants.    :   January 25, 2011
     ------------------------------------X
9

10       TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
              BEFORE THE HONORABLE CHERYL L. POLLAK
11               UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Government:        U.S. DEPARTMENT OF JUSTICE
                                BY: ELIZABETH GEDDES, ESQ.
14                              271 Cadman Plaza East
                                Brooklyn, New York  11201
15

16   For the Defendant:        GEORGE W. GALGANO, ESQ.
                                Galgano & Associates
17                              399 Knollwood Road
                                White Plains, New York  10603
18
                                SCOTT SCRIBNIK, ESQ.
19

20   Court Transcriber:        RUTH ANN HAGER
                                TypeWrite Word Processing Service
21                              211 N. Milton Road
                                Saratoga Springs, New York  12866
22

23

24

25

     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service

1                                                                        2

2

3                              I N D E X

4

5   Witness           Exam-Court   Direct    Cross    Redirect   Recross

6   GOVERNMENT:

7   Scott Curtis                     23       54

8                            E X H I B I T S

9                       Description                    ID.    EV.

10  PLAINTIFF:

11    1      Letters in Support                        18     22

12    2      Article                                   18     22

13    3      List of Sureters                          59     --

14

15

16  CLOSING ARGUMENTS:

17  For the Government            52

18  For the Defendant Russo       54

19

20

21

22

23

24

25

3

1    (Proceedings began at 12:17 p.m.)

2              THE CLERK:   Andrew Russo.   Thank you.   Andrew Russo,

3    please come forward.   Okay.   Criminal cause for detention

4    hearing, USA v. Andrew Russo, 11-CR-00030.   Counsel?

5              MS. GEDDES:   Elizabeth Geddes for the Government.

6    Good afternoon, Your Honor.

7              THE COURT:   Good afternoon.

8              MR. SCRIBNIK:   Good afternoon, Your Honor.   Scott

9    Scribnik [Ph.].   I'm here from Miami on behalf of Mr. Russo.

10             MR. GALGANO:   Good afternoon, Judge -- or good

11   morning, rather.   George Galgano.   I'm also appearing for Mr.

12   Russo.

13             THE COURT:   Okay.   Counsel, are you admitted to this

14   court?

15             MR. SCRIBNIK:   Yes, ma'am.

16             THE COURT:   Okay.   Great.   Then you filed a notice

17   of appearance?

18             MR. SCRIBNIK:   I filed a notice of limited

19   appearance for purposes of this bail hearing.

20             THE COURT:   I see.   Okay.   All right.

21             Mr. Russo, I take it that you understand English?

22             THE DEFENDANT:   I hope so, Your Honor.

23             THE COURT:   Okay.   If at any point something is said

24   that you don't understand, please tell me, okay?

25             THE DEFENDANT:   I will, Your Honor.

4

1          THE COURT:  All right.  So we're here today for a

2   detention hearing.  What's the Government's position?

3          MS. GEDDES:  The Government seeks a permanent order

4   of detention as to Andrew Russo, the defendant.  The defendant

5   is the current street boss of the Colombo crime family.  He

6   was captured on several recordings in which he vocalized his

7   current position and he has been taken -- since his assumption

8   of this position back in March of this year, he has taken

9   numerous steps to "put the family back together again."

10  Stemming back from the early 1990s there was an internal war

11  between the Colombo family -- two factions of the Colombo

12  family which left it somewhat fragmented.

13          Andrew Russo in the past several months has been

14  reaching out to the various members of the Colombo crime

15  family who are not currently incarcerated or at that time were

16  not currently incarcerated to try and get them to pledge their

17  commitment to the Colombo family.  He has been captured on

18  consensual recordings indicating that any individual who does

19  not demonstrate his commitment to come back into the family

20  will be placed on his list of enemies, that he would share

21  that list with other organized crime families, and that he

22  would indicate that anyone in other organized crime families

23  who are associated with those individuals who did not come

24  back from the Colombo crime family would also be placed on his

25  list of enemies.

5

1            In his position as the street boss of the Colombo

2    crime family he has numerous captains, members, and associates

3    to carry out the violent criminal activities of the Colombo

4    family.  He has shown himself to be a very involved boss

5    meeting frequently with his captains indicating that he wants

6    to get involved in the ins and outs of what these individuals

7    are doing.  And as demonstrated in the indictment members and

8    associates of the Colombo crime family continue to commit

9    numerous violent crimes in an effort towards their ultimate

10   goal of making money for the family.

11            In light of the defendant's position as the street

12   boss of the family and the resources that he has at his

13   disposal he, the Government submits, poses a significant

14   danger to the community.  The Government is certainly

15   satisfied with the bail packet that's my understanding the

16   defendant will submit is sufficient to guarantee his

17   appearance in court.  What's the Government's argument is that

18   the defendant does, in fact, pose a danger, that he will not

19   and cannot abide by the conditions of release.

20            There are additional notes set forth in the

21   detention memo filed by the Government but I think there are a

22   few interesting additions included in that memorandum and one

23   Mr. Russo was caught on tape stating, "I simply cannot rest.

24   I cannot let it go."  I think he believes or I submit that he

25   believes based on the recording that he is one of the last

1  individuals out there who has the capability to protect the

2  interests of the Colombo family and perhaps his family's

3  involvement in the Colombo family, his blood relatives'

4  involvement.

5          For those reasons and the reasons set forth in the

6  Government's attention memorandum the Government submits that

7  there are no conditions or combination of conditions that

8  could protect the safety of the community should Mr. Russo be

9  released on a bail package pending trial.

10         THE COURT:  What is the basis of the Government's

11 proffer that Mr. Russo has had a hand in any of the criminal

12 activities that are charged in the indictment that he's

13 ordered them or was aware of them or he directed that may be

14 conducted?  He is captured on the consensual recording

15 discussing with his captains one particular extortion that is

16 charged in the indictment.  That's the extortion of the

17 Gambino crime family as it related to a Colombo family

18 associate who had been stabbed by an individual who was

19 affiliated with the Gambino crime family.

20         On other consensual recordings his captains were

21 captured stating how Andrew Russo had directed them to reach

22 out to particular individuals that -- Andrew Russo is also

23 captured on the recording stating that it's very important

24 that the administration -- which includes, of course, Andrew

25 Russo, that the administration be kept apprised of any

7

1   situations pertaining to other organized crime families.

2   There are numerous of such situations referenced in the

3   indictment.  He has shown himself on these consensual

4   recordings based on his words as well as his co-conspirator's

5   words to be very involved in a situation in the affairs of the

6   family and to keep tabs on his captains.

7           He's also captured on recordings directing the

8   captains to reach out to different individuals in an attempt

9   to collect money and other potentially lucrative ventures for

10  the Colombo -- illegal lucrative ventures for the Colombo

11  crime family.

12          THE COURT:  All right.  Let me hear from the

13  defendants, Counsel.

14          MR. GALGANO:  Thank you, Your Honor.  May it please

15  the Court, I believe the Court is mindful that obviously any

16  pretrial detention hearing involves very serious stakes for

17  the defendant.  I believe this one is extraordinarily serious

18  and that's because Mr. Russo is 76 years old.  There are 39

19  defendants charged in this case.  It's a 60-count indictment.

20  I don't think it's unfair to assume that it will take a long

21  time for this case to get to trial given conflicting

22  schedules, et cetera, and I think under those circumstances if

23  the Government is wrong about Mr. Russo and the Court accepts

24  the Government's proffer in this case, pretrial detention of a

25  man presumed innocent would threaten to rob him of a

8

1  significant portion of the rest of his life.  That's why this

2  case is particularly serious and this detention request is

3  serious.  That's why family and friends are here in the

4  courtroom -- flooding the courtroom to support Mr. Russo.

5  That's why they are here to present a bail package that the

6  Government has already conceded as far as flight is concerned

7  is a sufficient bail package and that would be a package in

8  excess of four million dollars.

9          The people who are here in this courtroom include a

10  contingent of people who are legally deaf and the reason they

11  are here, Your Honor, because Mr. Russo has basically spent a

12  large part of his life helping people who are deaf get jobs,

13  fill out forms.  He learned sign language so he could help the

14  deaf because he met somebody who was deaf and then it became

15  part of his mission.

16          I would ask the court to allow one person who is an

17  interpreter to actually face the rest of the people and allow

18  her perhaps from that area back there to use sign language so

19  that they could hear what is going on in court.

20          THE COURT:  Well --

21          MR. GALGANO:  Her name is Tabitha Bobbick [Ph.].

22          THE COURT:  Just for the record, she's been doing it

23  during the entire time that we're here and that's fine.

24          MR. GALGANO:  Okay.  Thank you, Your Honor.  Thank

25  you.

9

1          I don't want to presume anything about the Court's

2    review of the indictments so I would like to take a couple of

3    minutes to just go through it with the Court because there are

4    so many defendants including another individual named Russo,

5    and I want to be very specific about what Andrew Russo is

6    charged with.  He is charged -- out of the 60 counts he is

7    charged in three of the counts.  Does the Court happen to have

8    a copy of the indictment?

9          THE COURT:  I do.

10         MR. GALGANO:  Okay.  If the Court would turn to page

11   51-52, those two pages.  That is where the Government alleges

12   the RICO conspiracy.  That's the first account that he is

13   charged in.  And of all the racketeering acts that the

14   Government is alleged to have -- that Mr. Russo committed

15   there are two that name him individually, that's Racketeering

16   Act 16 and Racketeering Act number 23.  Both of those

17   Racketeering Acts are themselves conspiracies, not actual

18   substantive conduct, but conspiracies.

19         So if the Government has essentially charged in

20   Count II is that Mr. Russo engaged or participated in a RICO

21   conspiracy to commit underlying conspiracies because those are

22   the only two that name him individually -- Racketeering Act 16

23   is at page 71 of the indictment.

24         In that Act the Government alleges that Mr. Russo

25   combined, conspired, et cetera, to obtain property money

1   belonging to the Gambino family and that's the incident that

2   the Government referred to earlier.  That was a situation in

3   which an individual was stabbed and friends of that individual

4   were trying to help that person obtain money for medical

5   expenses.  The person is in a wheelchair.  He was stabbed and

6   left paralyzed and the allegation is that Mr. Russo

7   participated in an effort to extort money from the Gambino

8   family in order to pay the medical expenses of this

9   individual.  That's the allegation.  I will get to the details

10  of that in a moment.

11          The second racketeering act, conspiracy charged in

12  Count II is Racketeering Act Number 23 and that is at page 79,

13  Your Honor, and that involves a conspiracy to collect a debt

14  from a John Doe number 16, not the actual collection of a

15  debt, not actual extortion but another agreement to extort.

16  That's -- those are the only two acts under Count II that

17  specifically name Mr. Russo.

18          The next two counts that name Mr. Russo are Count 41

19  at page 107, which is the actual conspiracy extortion

20  involving the Gambino family.  So what I just argued was the

21  Racketeering Act is now transferred into an actual count.

22  That's Count 41.  And Count 49 is the conspiracy to collect

23  the debt from John Doe number 16.  So notwithstanding the 100

24  or so pages of this indictment and notwithstanding the 39

25  defendants and 60 counts we really have two incidents after

1    March of 2010, one involving an effort, a conspiracy, and an

2    agreement allegedly to collect a debt from the Gambino -- to

3    collect money from the Gambino family and another one was to

4    collect the debt from some unidentified John Doe number 16.

5            Why is this all important, Judge?  Why is it

6    important that this is all conspiratorial or allegations of

7    conspiracy?  Number one, there is no statutory presumption of

8    dangerousness in this case.  There's no mandatory minium so

9    we're not here in the same situation as the prior defendant.

10   There is no statutory presumption.  There's no evidence, not a

11   shred of evidence of actual violence.  This man is 76 years

12   old.  They know him and in 76 years they don't come up with --

13   they can't come up with one incident, one event, one shred of

14   actual violence by Andrew Russo.  No evidence he possesses a

15   weapon or has possessed a weapon.  No evidence he directed any

16   violence.  No evidence he's harmed anyone.  No evidence in

17   this indictment of any conduct whatsoever.

18           The only evidence that the Government refers to is

19   their own proffer of recorded conversations involving words.

20   We made a request yesterday through Mister -- Mr. Galgano made

21   a request of the proffer for those transcripts because we know

22   that the Government hasn't provided the full context to the

23   Court.  Those transcripts are not yet available.  We were told

24   that they would be available within the week.

25           So we're operating at a bit of a disadvantage here

1  because we can't put those words that they're claiming come

2  from the transcript into context, so obviously we don't

3  believe the Government has met its burden here today.  That's

4  why we want to go forward within his right to have a detention

5  hearing, but certainly we want to be able to look at those

6  transcripts and see what those transcripts actually say to put

7  them into context.

8          These are words that they take.  They're portrayed

9  as a conspiracy.  They put him at the top of the indictment.

10 Everybody else is alphabetical.  Call him a street boss and

11 asked for detention.  The best evidence, Judge, that no

12 conspiracy existed, no agreement existed is that none of the

13 conduct that they alleged materialized.  There's no

14 evidence -- they presented no evidence that the Gambino family

15 made this payment that they're alleging.  No evidence of any

16 retaliation.  No evidence anyone was harmed.  No evidence that

17 any debt was actually collected from this John Doe number 16.

18         The best evidence of a conspiracy is that the

19 conduct actually materialized.  There is no conduct in this

20 case.  They just take words on tapes that we need to review,

21 but right now those words in and of themselves don't carry the

22 Government's burden of clear and convincing evidence that he's

23 a danger to the community.  The Government's theory is that

24 Mr. Russo became a street boss after March of 2010 and he has

25 been out -- released for three or four years from custody.

13

1   They say he became the street boss in March of 2010.  This is

2   an allegation.  No one has said it under oath.  These are

3   excerpts from conversations.  I don't believe he said those

4   words.  When they say Mr. Russo, they're referencing to him

5   being the boss, the ones they quote in their memo are

6   reference to "the guy" and the Government puts in brackets

7   "Andrew Russo."  I didn't see any quote in the tape of any

8   individual saying Andrew Russo is "the guy."

9            There is a danger of pretrial detention based on

10  inferences and hearsay that are so weak and I want to recount

11  for the Court that this type of inference upon inference has

12  caused detriment to Mr. Russo in the past.  There's a Second

13  Circuit opinion called Russo v. Hasty, which is at 173 F.3d

14  846, in which the Second Circuit reversed a sentence by the

15  Parole Commission that was based on misinformation that Mr.

16  Russo was the boss or the acting boss of the Colombo family.

17  And the Second Circuit said based on Judge Hurley's statement

18  that he may have been misinformed and the Parole Commission

19  may have been misinformed, the Second Circuit reversed.

20  That's not clear and convincing evidence of danger but yet the

21  inference upon inference and hearsay where we don't see any of

22  the transcripts runs the risk of doing the same thing that

23  happened to him ten years ago.

24            There are hundreds of hours of recorded

25  conversations according to the Government's detention memo.

1    Where is the clear and convincing evidence that he has done --

2    has ordered anybody harm, that he's harmed anyone, that he's

3    ordered an assault, that he has actually collected money from

4    anybody?  This would not get past a Rule 29 if this were the

5    evidence that the Government would present in a criminal case.

6    Context is important.  I want to get the issue that the only

7    real meeting that they talk about in the detention memo which

8    is this meeting that Mr. Russo pre -- allegedly attended where

9    there were other friends of an individual named Sam Perry

10   [Ph.] who had been stabbed, the man is in a wheelchair as a

11   result.  Apparently he is incapacitated.  He needed money for

12   medical bills and apparently the tapes will show that there

13   was a discussion about seeing if the State of New York would

14   pay for this individual's medical bills.  My understanding is

15   that there's no evidence that Mr. Russo said let's use

16   violence against the Gambino family or let's -- we're not

17   going to retaliate if they pay.

18          Apparently there was some discussion from what I

19   understand the Government is alleging about resolving the

20   matter and getting medical bills paid -- or getting bills paid

21   without violence.  So, you know, while the Government wants to

22   portray it as a meeting where Mr. Russo was approached about

23   this because he's a wise guy, I think the more accurate

24   description of this is he was approached because he is a wise

25   man and violence, if there was any even contemplated, was

1    avoided and there was no violence, no evidence of any violence

2    as a result of this alleged meeting that the Government talks

3    about.

4           In the Government's memo they cite to the boss cases

5    that I'm sure the Court is familiar with because the Court

6    presided over the Gotti decision.  Certainly when I read those

7    I worry that it might have superficial appeal because there

8    are a number of decisions out of the District Court and the

9    Second Circuit that deal with these street boss and acting

10   boss cases and allow detention under those cases.  I think the

11   Court ought to know the real -- the distinction -- the

12   important distinctions between this case and those cases so I

13   would like to go through a few of those cases for the Court.

14          U.S. v. Cirillo is a case that the Government cites

15   that this individual was the actual boss of the -- of one of

16   the families.  There were seven made members.  This is -- I'm

17   sorry.  This is 05-212 affirmed at 149 Federal Appendix 40,

18   U.S. v. Cirillo, C-I-R-I-L-L-O.  In that case, according to

19   the opinion there were seven made members who provided

20   statements to law enforcement identifying Cirillo as the

21   acting boss.  There was a list of proposed Genovese members

22   found on Cirillo's kitchen table upon his arrest.  Expert

23   witness testified at the bond hearing that the boss has a role

24   in reviewing the proposed inductees and that would explain the

25   list of proposed members on Mr. Cirillo's desk and there were

16

1  surveillance photos.

2          U.S. v. Gotti, which is at 219 Fed. Supp. 2d 296,

3  affirmed at 312, F.3d 535.  This is the case involving Peter

4  Gotti where the Government presented testimony, transcripts,

5  surveillance records, photos, et cetera, documenting Mr. Gotti

6  as the acting boss.  The defendant did not seriously dispute

7  it according to the opinion.  There was expert testimony.

8  There was a proffer that Peter Gotti represented the family at

9  meetings with other organized crime families.  There was a

10 proffer that secret proceeds from the extortion made their way

11 to Mr. Gotti.  There was evidence in that case according to

12 the proffer that Peter Gotti attempted to surreptitiously

13 contact his brother in prison.  The Court is familiar with

14 that evidence.  No such evidence in this case.

15          U.S. v. Defitti, which is at 7 Fed. Supp. 2d 390,

16 there was evidence that the individual had been the acting

17 boss for four to five years, evidence that the individual

18 through the proffer made frequent visits to the prison to meet

19 with the boss and receive instructions.  A number of

20 confidential sources identified Mr. Defitti as the acting

21 boss.  One confidential source informed the FBI that he was --

22 that Defitti was the go-between or the actual boss.  There

23 were circumstantial evidence linking Defitti to the collection

24 of extortion payments from the garment center and sworn

25 testimony about how the payments were delivered coupled with

1    surveillance.  Those are three leading cases that the

2    Government cites and there are other cases that involve

3    violence, actual harm, actual injury, actual threats, none of

4    which exists in this case.

5            The distinctions here are stark.  If he is the

6    street boss where is the one shred of evidence that he

7    received any money, where he followed the money, where is the

8    evidence that he received in the last nine months that he was

9    the so-called "street boss" even a penny from the efforts of

10   the alleged family?  Where is the evidence of any meetings or

11   communications between the alleged street boss and the acting

12   boss and/or the boss as existed in the other cases.  I've

13   heard nothing of the sort here.  There's no sworn testimony,

14   no complete transcripts, no affidavits, excerpts of a few

15   conversations devoid of context.  And the only incident the

16   evidence will show at trial is that this meeting that they're

17   talking about there was an effort to obtain medical expenses

18   for a person who had been stabbed in an incident.  If the

19   Government's evidence is to be believed that evidence will

20   show that Mr. Russo was not a wise guy; he was a wise man in

21   how this matter was handled.

22           Positives, Judge.  Seventy-six-year-old man.  He's a

23   U.S. citizen.  Never lived outside the United States.  He has

24   a wife who is here, Ruth; a daughter who is here; he has nine

25   grandchildren, seven great grandchildren; no ties outside the

1   United States.  All his ties to Long Island.  Never missed a

2   court date.  Sureties are here in court and we have a

3   substantial contingent of the deaf community who is here.

4          One individual would like to communicate with the

5   Court, with the Court's permission, about his experience with

6   Mr. Russo what a kind person he is, not the person that the

7   Government was described.  And we have number of letters, over

8   30 letters that have been written.  We apologize for giving in

9   to the Court now but it's been a mad rush in the last three

10  days to get these together.  We'll provide a copy obviously to

11  the Government.  May I hand them to the Court?

12          THE COURT:  Of course.

13          MR. GALGANO:  One of whom is from the individual

14  James Caan, whom the Court I'm sure is familiar with, talking

15  about his friendship with Mr. Russo extending back many years.

16          I also want to hand to the Court an excerpt of an

17  article or actually the article from -- I don't have the date

18  but it was a number of years ago while Mr. Russo was a

19  defendant in a Federal Court trial in which he jumped in the

20  bay to rescue two men and there was an article written about

21  it, about his heroic efforts to save somebody.  Can I mark

22  that actually as an exhibit for purposes of this bail hearing?

23          THE COURT:  Why don't you mark it as Exhibit 2 and

24  we'll mark all of the letters that you just handed up as

25  Exhibit 1.

19

1          (Exhibits 1 and Russo-2 marked for identification.)

2          MR. GALGANO:  Very good.  I'll just style it Russo

3     Exhibit 2, if that's okay.

4          THE COURT:  Yep.  That's fine.

5          MR. GALGANO:  May I hand it to the Court?

6          THE COURT:  Please.  Do you have a copy for the

7     Government?

8          MS. GEDDES:  I have just received a copy.

9          THE COURT:  Okay.  Thank you.

10          MR. GALGANO:  There is also an award presented to

11     him from the Pelicans Club of the Deaf, but rather than

12     present the award to the Court I think it would be better if

13     the Court would just hear from an individual who is legally

14     deaf and who Mr. Russo has helped not only him but many, many

15     other individuals and he would be better to describe it than

16     I.

17          THE COURT:  Well, let me just -- I mean, before we

18     do that I guess my concern is the following.  The Government

19     is moving on danger grounds, correct?

20          MS. GEDDES:  Correct.

21          THE COURT:  And I -- as much as I understand that a

22     proffer is sufficient I don't find your proffer sufficiently

23     specific enough in this case to hold this defendant on the

24     Peter Gotti type of detention order.  So what I am going to

25     ask is whether or not the Government is prepared to put on

20

```
 1   evidence in the form of witnesses and/or tape-recordings,
 2   anything else to further substantiate the proffer that you've
 3   made today.
 4          MS. GEDDES:  Yes, Judge.  The Government is
 5   prepared.  I would ask if we could just have a day to clip the
 6   excerpts or even, I guess, play them this afternoon.  Could
 7   probably have the excerpts clipped for the Court and provide
 8   various recordings how much the defendant's position in the
 9   Colombo crime family is vividly shown.
10          THE COURT:  Well, I think I would prefer to put it
11   on for later this afternoon.  We'll take a lunch recess and
12   we'll put it on for -- Senay, what do we have on for this
13   afternoon?
14          THE CLERK:  Well, we just -- why don't we put it all
15   at two, you know?
16          THE COURT:  I'm just not sure that two o'clock is
17   going to give the Government enough time.  That's what I'm
18   saying.
19          THE CLERK:  3:30.
20          THE COURT:  Three o'clock?
21          THE CLERK:  3:30.  Okay.  Yeah, 3:30.
22          THE COURT:  3:30, counsel.  We'll put this over for
23   second call.
24          MR. GALGANO:  Your Honor, may I ask through the
25   Court that the Government provide us with the actual
```

21

1  transcripts?

2          THE COURT:  Of course.

3          MS. GEDDES:  We don't have transcripts to provide,

4  but we'll provide copies of the report -- excerpts of the

5  recordings.

6          MR. GALGANO:  Well, just so we're clear, Judge, when

7  they say "excerpts" do you mean precisely --

8          THE COURT:  Are you going to play them?

9          MS. GEDDES:  Yes, Judge.

10         THE COURT:  She's going to play them so we can hear

11 them.

12         MS. GEDDES:  Okay.

13         THE COURT:  Okay.

14         MR. GALGANO:  So there are no transcripts are

15 available at this point?  Is that --

16         MS. GEDDES:  That's correct.

17         MR. GALGANO:  Okay.  Thank you, Your Honor.

18         THE COURT:  Okay.  All right.

19         MS. GEDDES:  Thank you.

20         THE COURT:  So we'll put this on for second call.

21         (Off the record.)

22         THE CLERK:  Okay.  This is second call on USA v.

23 Andrew Russo for detention hearing, 11-CR-30.

24         Counsel, please state your name again for the

25 record.

22

1          MR. GALGANO:  George Galgano.

2          THE CLERK:  [Inaudible] the bottom.  Is it green?

3          MR. GALGANO:  It's green now.

4          THE CLERK:  Thank you.

5          MR. GALGANO:  George --

6          THE CLERK:  State your name for the record.

7          MR. GALGANO:  George Galgano for Andrew Russo.

8          MR. SCRIBNIK:  Good afternoon, Your Honor.  Scott

9   Scribnik for Mr. Russo as well.

10         THE COURT:  All right.  Good afternoon.  We put this

11  on for second call to allow the Government to put on

12  additional evidence in support of your request to have the

13  defendant held based on danger to the community.  Before I

14  forget because I'm concerned that I will forget this, during

15  the break I did review all of the letters that have been

16  submitted to the Court by the defendant in support of his

17  application as well as defendant's Exhibit 2, which was the

18  article relating to the sea rescue and I will take that all

19  into consideration to the final arguments.

20         But I wanted to note that I've received a request

21  from the press for release of these letters.  Does anyone have

22  any objection?  Then they are part of the Court record

23  formally.

24              (Exhibits 1 and 2 are admitted.)

25         MR. GALGANO:  No, Your Honor.

                        Curtis - Direct                        23

1              THE COURT:  Okay.  All right.  So that will be made

2    available to the press at the conclusion of the proceedings.

3              Okay.  All right.  Let me hear from the Government

4    with respect to your additional evidence.  Whatever you wish

5    to proceed with.

6              MS. GEDDES:  Yes, Your Honor.  The Government calls

7    Special Agent Scott Curtis.

8              THE CLERK:  Okay.  Mr. Curtis, please raise your

9    right hand.

10                        SCOTT CURTIS, Sworn

11             THE CLERK:  Thank you.  Your name for the record

12   again.

13             THE WITNESS:  Scott Curtis, C-U-R-T-I-S.

14             THE CLERK:  Thank you.

15             THE COURT:  All right.  Counsel, please.

16                        DIRECT EXAMINATION

17   BY MS. GEDDES:

18   Q.   By whom are you employed?

19   A.   Federal Bureau of Investigation.

20   Q.   For how long?

21   A.   About 15 years now.

22   Q.   And are you assigned to a particular unit or squad of the

23   FBI?

24   A.   Squad C38 of the New York office.

25   Q.   What is Squad C38 responsible for?

Curtis - Direct                                    24

1   A.    Investigating the criminal activities of the Colombo

2   organized crime family.

3   Q.    And how long have you been assigned to Squad C38?

4   A.    Almost 14 years now.

5   Q.    Do you have information about the defendant Andrew Russo?

6   A.    Yes.

7   Q.    Directing your attention to January of 2010 -- excuse

8   me -- January of 2010, correct -- do you have -- or March

9   2010, excuse me.  Do you have information about who became the

10  boss of the Colombo family at that time?

11  A.    Yes.

12  Q.    How did you obtain that information?

13  A.    Cooperating witness that I was operating was receiving

14  information for a couple months up to that point about whether

15  Andrew Russo was going to assume the title of street boss of

16  the Colombo family at that point and then once he got off

17  probation in March of 2010 Anthony Russo confirmed that Andrew

18  was going to be the street boss.

19  Q.    And based on the information provided from the

20  cooperating witness, as well as your review of consensual

21  recording prepared by -- or made the cooperating witness, who

22  is Anthony Russo?

23  A.    During that period of time he was a soldier in the

24  Colombo family and in June of 2010 he became the acting

25  captain for Teddy Persico's crew because Teddy Persico was

Curtis - Direct                                          25

1   arrested in March of 2010.

2   Q.    And do you have information about a meeting that occurred

3   on June 29th of 2010?

4   A.    Yes.

5   Q.    Where did that meeting take place?

6   A.    On Gaynor Street in Staten Island, New York.

7   Q.    Did the FBI conduct surveillance of that meeting?

8   A.    Yes.

9   Q.    And have you had an opportunity to review this

10  surveillance and speak with other agents who were present

11  during this surveillance?

12  A.    Yes.

13  Q.    Based on your conversations with other agents and the

14  surveillance that you have reviewed were you able to determine

15  who attended that meeting?

16  A.    Yes.

17  Q.    Who attended that meeting?

18  A.    Andrew Russo, Billy Russo, Benjamin Castellazzo, Ritchie

19  Fusco [Ph.], Dennis Delucia, Anthony Russo, Joseph Carna, Paul

20  Bevacqua.

21  Q.    Do you see that individual you identified as Andrew Russo

22  in the courtroom today?

23  A.    Yes.

24         MS. GEDDES:  Indicating the defendant, Your Honor.

25         THE COURT:  So indicated.

Curtis - Direct                                    26

1   BY MS. GEDDES:

2   Q.    You mentioned Billy Russo.  Who is that?

3   A.    Andrew's son.

4   Q.    And were you able to determine based on your review of

5   consensual reporting as well as your debriefing of cooperating

6   witnesses what position if any Billy Russo held in the Colombo

7   family in June of 2010?

8   A.    He was a captain in the Colombo family.

9   Q.    How about Dennis Delucia, who you also referenced at

10  attending that meeting.

11  A.    He's a captain in the Colombo family.

12  Q.    Joseph Carna?

13  A.    Captain in the Colombo family.

14  Q.    Ritchie Fusco.

15  A.    He's the consigliere of the Colombo family.

16  Q.    Benjamin Castellazzo.

17  A.    The younger boss of the Colombo family.

18  Q.    Paul Bevacqua.

19        MR. SCRIBNIK:  Your Honor, if I may just object and

20  get a predicate.  Is this his expert opinion or is this based

21  on information that he has learned through witnesses giving

22  him testimony or giving him statements, et cetera?  Well, I

23  can approach him on --

24        THE COURT:  Well, you'll have an opportunity to

25  cross-examine him.  I think her predicate question put that

Curtis - Direct                                    27

1  very clearly, but you can review the transcript.  Go ahead.

2  BY MS. GEDDES:

3  Q.    Benjamin Castellazzo.

4  A.    Yes.

5  Q.    Based on the information provided by cooperating

6  witnesses to -- as well as your review of consensual

7  recordings, who is Benjamin Cast -- or what position, if any,

8  did Benjamin Castellazzo hold in the Colombo family as of June

9  2010?

10  A.    The acting underboss of the Colombo family.

11  Q.    I'm now going to play a clip from a portion of that

12  meeting.  Have you had an opportunity to listen to at least

13  excerpts of the recording made on June 29, 2010, of the

14  meeting at Gaynor Street?

15  A.    Yes.

16              THE COURT:  This is an audio recording, I take it?

17              THE WITNESS:  It's a consensual recording, Judge.

18              MS. GEDDES:  It is an audio recording.

19              THE WITNESS:  It's an audio consensual.

20  (Audio recording played.)

21              MR. SCRIBNIK:  I don't know if it's clear to the

22  Court but it's not to the [inaudible].

23              THE COURT:  I'm only picking up snatches of it.

24  Perhaps the --

25              THE WITNESS:  I think it's a little too loud.  Too

Curtis - Direct                                              28

1    close.  Maybe pull it back a little.

2    (Audio recording played.)

3           MS. GEDDES:  Let me [inaudible] clear the recording

4    is much easier to hear with headphones.  I'm happy to provide

5    a copy to the Court and to defense counsel, again, so

6    everybody can listen with headphones.

7    BY MS. GEDDES:

8    Q.   However, Special Agent Curtis, have you had an

9    opportunity to review the recording with the assistance of

10   headphones?

11   A.   Yes, several times.

12   Q.   Can you please describe to the Court what transpired

13   during that portion of the meeting?

14          MR. SCRIBNIK:  I'm going to object to that, Judge.

15   I mean, if there's a recording and it's not audible or the

16   Government is unable to play it --

17          THE WITNESS:  It's audible with headphones.

18          MR. SCRIBNIK:  I understand, but I don't think it's

19   necessary to call a witness to testify as to the substance of

20   a conversation.

21          THE COURT:  Well, the Government can put evidence on

22   via proffer without tapes at all, but your colleague there

23   made a very persuasive argument this morning that the

24   information provided was fairly vague so that's why I called

25   for this hearing.  If you want, we can put this over till

Curtis - Direct                                          29

1    tomorrow and I will listen to these tapes this evening, but

2    I'm not going to sit here and listen to them in the courtroom

3    for heaven only knows how long tonight.

4            The alternative is to allow the witness to summarize

5    his review of the tapes and if you want to challenge his

6    summary I'll certainly allow you to do that on cross-

7    examination.  You all have had at least a brief opportunity to

8    hear it outside.  I haven't heard it at all so, you know, I

9    propose that we either proceed and allow the agent to testify,

10   which I probably would do anyway, and then see where we are or

11   we could just put this whole thing over till tomorrow which

12   gives everybody more time to proceed.

13           The problem is that I'm not going to be here

14   tomorrow so that complicates matters, you know, so --

15           MR. SCRIBNIK:  Your Honor, if the Government is

16   intent on having him continue to testify the problem is I do

17   want to listen to the tape because I can't confront his

18   summary without having an opportunity to really listen to them

19   carefully with headphones.  We had an opportunity outside to

20   listen to them.  I only got to hear one snippet with

21   headphones and I really couldn't hear it well, so it's

22   impossible for me to challenge his summary without having an

23   opportunity to look at -- listen to the tape and read a

24   transcript.

25           THE COURT:  Well, then I suggest, Counsel, that we

Curtis - Direct                                              30

1   just put it over for tomorrow.  Everyone will have some time

2   tonight to review things and I will alert Judge Mann this

3   evening that this is going to happen tomorrow and she'll be

4   given an opportunity to listen to the tapes tonight.

5              MR. SCRIBNIK:  Your Honor, my client wishes to

6   proceed now.  I'm -- I have a catch a plane tonight.  I've got

7   a matter tomorrow in Miami, so I don't want my schedule to

8   interfere with Mr. Russo.  He wants to proceed now, so that's

9   his wish.

10             THE COURT:  All right.  He understands that you're

11  not going to have an opportunity to listen to the tapes

12  tonight, right?  Okay.  All right.

13             Go ahead.

14  BY MS. GEDDES:

15  Q.   Actually, Agent Curtis, could you please transcribe to

16  the Court what transpired during this meeting that was

17  consensually recorded and that you've had an opportunity to

18  review?

19  A.   Andrew Russo was introducing -- or introduced Anthony

20  Russo as the acting captain for Teddy Persico at this meeting

21  to all the other captains in the administration of the Colombo

22  family.

23  Q.   Let me interject for one moment.  Who -- based on your

24  review of the meeting who was presiding over this meeting?

25  A.   Andrew Russo.

Curtis - Direct                                    31

1   Q.   And during the excerpt that we just played for the Court

2   as garbled as it may have initially appeared what specifically

3   occurred then immediately before Andrew Russo introduced

4   Anthony Russo as an acting captain?

5   A.   He -- Andrew gave out instructions to everybody about

6   getting in and out of the meeting location quickly and

7   efficiently so that surveillance could not pick up on them and

8   that anything that was discussed within that meeting there

9   would not be discussed outside the meeting.

10  Q.   And based on your knowledge and experience in this

11  investigation and as an agent assigned to investigating the

12  affairs of the Colombo family what is your opinion regarding

13  Andrew Russo's position in the Colombo family based on a

14  review of the meeting?

15  A.   That he was in charge of the Colombo family.

16  Q.   Directing your attention to September 9th of 2010 did the

17  FBI conduct surveillance of a location at Staten Island by

18  that date?

19  A.   Yes.

20  Q.   Where was that surveillance conducted?

21  A.   On Finlay Street in Staten Island.

22  Q.   And based on your review of -- have you had an

23  opportunity to review some of the surveillance that was taken

24  on that day?

25  A.   Yes, I was there also.

Curtis - Direct                                          32

1    Q.   And did you also have an opportunity to discuss what

2    other agents of the FBI observed on that day?

3    A.   Yes.

4    Q.   Based on your discussions with other agents as well as

5    your own surveillance who were you able to determine attended

6    that meeting?

7    A.   Andrew Russo, Benjamin Castellazzo, Ritchie Fusco, Dennis

8    Delucia, Reynold Maragni, Anthony Russo, Joseph Savarese, and

9    I believe there was a couple others.

10   Q.   You mentioned Reynold Maragni.  Based on the information

11   that you've obtained from cooperating witnesses as well as

12   your review of consensual recordings what position, if any,

13   does Reynold Maragni hold in the Colombo family?

14   A.   He's a captain in the Colombo family.

15   Q.   And, again, the other individuals that you referenced

16   what generally was their position in the Colombo family?

17   A.   They were all made members of the Colombo family.

18   Q.   And with the exception of Joseph Savarese did those

19   individuals hold ranking positions in the Colombo family?

20   A.   Yes.  Joseph Savarese was a soldier.  Everybody else was

21   a captain or above.

22   Q.   And did a cooperating witness have an opportunity to

23   drive an individual to or from that meeting?

24   A.   Yes.

25   Q.   Who did the cooperating witness drive to the meeting?

Curtis - Direct                                    33

1   A.    Anthony Russo.  Drove Anthony Russo there, then he drove

2   Anthony -- then he drove Reynold Maragni away from the

3   location first, and then he drove Anthony Russo and Benjamin

4   Castellazzo away from the location.

5   Q.    And have you had an opportunity to review the recording

6   that the cooperating witness made on that day?

7   A.    Yes.

8   Q.    And have you also had an opportunity to debrief the

9   witness who made that recording on that day?

10  A.    Yes.

11  Q.    Based on your debriefing of the witness as well as your

12  review of the consensual recording what did you learn

13  transpired during that meeting?  And to be clear did the

14  cooperating witness attend the meeting?

15  A.    No, he was sitting in his vehicle down the block.

16  Q.    What did you learn transpired at that meeting?

17  A.    That there was some kind of dispute between Andrew Russo

18  and Reynold Maragni where Reynold Maragni was told to leave

19  the meeting because of a couple problems that Andrew Russo had

20  learned dealing with -- related to Reynold Maragni.  And then

21  when Benjamin Castellazzo and Anthony Russo exited the meeting

22  and the cooperating witness was transporting them, they

23  discussed a couple of individuals whose names were brought up

24  as possibly being proposed for membership in the Colombo

25  family and also discussed a beef or a dispute involving Roger

Curtis - Direct                                    34

1   Califano.

2   Q.    And who is Roger Califano?

3   A.    He's an associate of the Colombo family.

4   Q.    And based on your debrief of the property witness as well

5   as your review of the consensual recording were you able to

6   determine who at that time -- in September of 2010 who at that

7   time was the boss of the Colombo family yet?

8   A.    Andrew Russo was the street boss of the Colombo family.

9   Q.    And just for clarification can you explain the difference

10  between the street boss and the official boss or acting boss?

11  A.    The official boss of the Colombo family is still Carmine

12  Persico but he's in prison for 100-year sentence.  His son

13  Alphonse Persico was designated as the acting boss for his

14  father.  He is now in prison for life.  Therefore, they need a

15  boss that's not incarcerated and has the ability to interact

16  with not only the Colombo family but with other families to

17  mediate disputes and run the family.  That individual in March

18  of 2010 was designated as Andrew Russo at that point.

19  Q.    And why was Andrew Russo designated in March of 2010?

20  Was there anything significant about that date?

21  A.    That's when he got off federal probation.

22        MS. GEDDES:  I'm now going to play one additional

23  excerpt.

24  BY MS. GEDDES:

25  Q.    I'm going to direct your attention to May 11th of 2010.

                    Curtis - Direct                    35

1    Have you reviewed a recording that was made by a cooperating

2    witness on that date?

3    A.    Yes.

4    Q.    And do you recall who was present on that date?

5    A.    Andrew Russo, Billy Russo, Paul Bevacqua, Ralph Scopo,

6    Frank Sorrentino.

7              MS. GEDDES:  I'm now going to play an excerpt from

8    that recording.

9    (Audio recording played.)

10   BY MS. GEDDES:

11   Q.    Could you please describe to the Court what was just

12   played?

13   A.    Ralph Scopo arrived at the location.  Paul Bevacqua

14   introduced him to Andrew Russo -- introduces Andrew Russo as

15   the boss of the Colombo family to Ralph Scopo.

16   Q.    What was that specific terminology that Bevacqua used in

17   introducing Andrew Russo?

18   A.    The *representante*.

19   Q.    And what do you understand "*representante*" to be?

20   A.    Boss.

21   Q.    And how do you make that determination?

22   A.    From research I've done on that term.

23   Q.    And when Andrew Russo can be heard on the recordings

24   accepting congratulations what did you understand that to be?

25   A.    That Ralph was accepting him as the boss of the family.

```
                    Curtis - Direct - Cross                      36
```

 1  Q.   Was accepting who?

 2  A.   Andrew.

 3          MS. GEDDES:  The Government has no further questions

 4  for this witness.

 5          THE COURT:  Counsel?

 6          MR. SCRIBNIK:  Yes, Your Honor.

 7                          CROSS-EXAMINATION

 8  BY MR. SCRIBNIK:

 9  Q.   Good afternoon, Agent Curtis.  I want to follow-up on

10  your discussion of the term "street boss," okay?  You

11  testified that according to the FBI the official boss right

12  now is Mr. Persico?

13  A.   Bottom line is Persico is the official boss of the

14  Colombo family and has been for a number of years.

15  Q.   And I believe you also testified -- and does he remain

16  the official boss to this day?

17  A.   Until the Commission takes him down, yes.

18  Q.   Okay.  And according to the FBI I think you said that

19  Allie Persico is the acting boss?

20  A.   Yes.

21  Q.   And according to you does he remain the acting boss to

22  this day?

23  A.   Yes.

24  Q.   Now, are you involved in other prosecutions in this

25  district involving alleged members of the Colombo family?

Curtis - Cross                                          37

1    A.    Yes.

2    Q.    Are you involved with Ms. Geddes, the prosecutor in the

3    prosecution of an individual named Tommy Gioeli?

4    A.    Yes.

5    Q.    Are you the case agent in that case?

6    A.    Yes.

7    Q.    Are you aware, sir, that Ms. Geddes has represented in a

8    pleading that Tommy Gioeli is the family's acting boss?

9    A.    He was the street boss and his reign ended the minute he

10   got arrested.

11   Q.    I'm going to repeat the question.  Is there a difference

12   between an "acting boss" and a "street boss"?

13   A.    Yes.

14   Q.    I'm going to show you a document that I would ask the

15   Court to take judicial notice of.  It is filed in case number

16   08-CR-0240, U.S. v. Tommy Gioeli, document 74-1.

17              MR. SCRIBNIK:  May I approach the agent?

18              THE COURT:  What's the date on that document,

19   Counsel?

20              MR. SCRIBNIK:  Date of the document is June 23,

21   2008.

22              THE COURT:  2008.

23              MR. SCRIBNIK:  Yes.

24              THE COURT:  Okay.  Go ahead.

25   BY MR. SCRIBNIK:

Curtis - Cross                                          38

1   Q.    Now, I assume Mr. Allie Persico has remained the acting

2   boss throughout the entire period that you've been assigned to

3   the Colombo family.

4   A.    Yes.

5   Q.    Let me show you a -- this document that I just identified

6   and ask you if you recognize the document as a memo of law in

7   support of the Government's motion for detention of Thomas

8   Gioeli.

9   A.    That's what it says.  It's the first time I've seen it.

10  Q.    Okay.  Well, do you know that Ms. Geddes is the

11  prosecutor in that case?

12  A.    Yes.

13  Q.    And you worked with her on both cases, correct?

14  A.    Yes.

15  Q.    Take a look at page 5 and I ask you to read this to

16  yourself and I ask you to confirm that according to the

17  Government in 2008 Mr. Gioeli was the acting boss.

18  A.    But it says acting boss or street boss.  And a lot of

19  people that don't have the institutional knowledge interchange

20  those two terms because they don't know the difference.

21  Q.    Does Ms. Geddes have the institutional knowledge?

22              MS. GEDDES:  Objection.

23              THE COURT:  Yes, sustained.

24  BY MR. SCRIBNIK:

25  Q.    Do you have the institutional knowledge?

Curtis - Cross                                        39

1   A.    I believe so.

2   Q.    Okay.  So was Tommy Gioeli the acting boss or the street

3   boss?

4   A.    He was the street boss.  His reign ended in June 2008.

5   Q.    Okay.  May I ask you, are you familiar with the

6   indictment of Mr. Gioeli?

7   A.    Yes.

8   Q.    Have you seen that document before?

9   A.    Yes.

10        MR. SCRIBNIK:  Might I approach the witness?

11        THE COURT:  Yes.

12  BY MR. SCRIBNIK:

13  Q.    This is the indictment, superseding indictment dated July

14  8, 2010.  That was just last year, correct?

15  A.    Yes.

16  Q.    Six months ago.  Let me show you paragraph 12 of the

17  indictment which is document number 822 in case number 08-CR-

18  240 and take a look at paragraph of the indictment.  Is it not

19  a fact that the Grand Jury and the Government has alleged that

20  Tommy Gioeli was the acting boss?

21  A.    That's what the indictment says.  Like I said people

22  interchange those two terms "street boss" and "acting boss"

23  because they don't have the institutional knowledge of the

24  specific difference.

25  Q.    Well, but you --

Curtis - Cross                                40

1   A.   Which I explained.

2   Q.   Did you explain this difference to the Grand Jury in that

3   case?

4   A.   I don't recall if I was the one who testified about his

5   position or not.

6   Q.   Okay.  Well, do you see any mention of Tommy Gioeli being

7   the street boss in that indictment?

8   A.   Not on this page I don't see it.

9   Q.   Do you see him referring as the acting boss, correct?

10  A.   Yes, yes.

11  Q.   So there were two acting bosses at the time or was there

12  one acting boss at the time?

13  A.   Tommy Gioeli was out on the street.  He was considered a

14  boss.  Specifically he was designated a street boss because he

15  was the only one that wasn't in jail that could run the

16  Colombo family.

17  Q.   Well, how does one become designated a street boss?  Who

18  does the designation?

19  A.   The boss.

20  Q.   The boss.  Okay.  So in this case in order for Mr. Russo

21  to be the street boss it would have had to have been

22  designated by Mr. Carmine Persico, correct?

23  A.   Yes.

24  Q.   Do you monitor Mr. Persico's communications from prison?

25  A.   I have on and off, not -- I'm not monitoring it every

Curtis - Cross                                        41

1   day.

2   Q.   Well, I assume the Bureau of Prisons does, correct?

3   A.   Depends what your definition of "monitoring" is.

4   Q.   Well, they listen to his phone calls, don't they?

5   A.   They don't listen to every phone call.  They record every

6   phone call.

7   Q.   You listen to any of those phone calls?

8   A.   I don't think I've listened to any of his phone calls in

9   over ten years.

10  Q.   Do you have any evidence as you sit there today of a

11  communication either written or oral from Carmine Persico

12  designating Mr. Russo as the street boss?

13  A.   No.

14  Q.   Now, does the street boss get the spoils of being the

15  street boss?

16  A.   Unfortunately, no.

17           THE COURT:  I'm sorry.  I'm going to object to that

18  question because I don't know what that means.

19           MR. SCRIBNIK:  I apologize, Your Honor.  Let me

20  rephrase it.

21  BY MR. SCRIBNIK:

22  Q.   Does the benefit of being the street boss mean that

23  you -- the street boss earns income from the activities of the

24  alleged mentors?

25  A.   Unfortunately, most of the time he doesn't.

Curtis - Cross                                    42

1    Q.    In this case do you have any evidence that Mr. Russo

2    during these nine months earned a single penny in his

3    activities as a street boss in your view?

4    A.    No.

5    Q.    Any evidence -- oh, strike that.  I assume another role

6    of the street boss is to meet with bosses from the other

7    families, correct?

8    A.    Yes.  If need be, yes.

9    Q.    Okay.  Well, in the nine months that you claim Mr. Russo

10   was street boss any evidence of any meetings between Mr. Russo

11   and the boss of any other family?

12   A.    Well, we did have him meeting with somebody from the

13   Lucchese family administration, Neil Migliori, and then he

14   also made comments on tape about the fact that he did meet

15   with other administration members from other organized crime

16   families, so yes.

17   Q.    Any surveillance of Mr. Russo meeting with any members --

18   any bosses of another family in the last nine months?

19   A.    Bosses I'm not sure because a lot of these families now

20   are so disrupted that they don't have one person designated as

21   a boss necessarily.  They have ruling panels of two, three,

22   four individuals who make up the administration of their

23   family so either one of them could technically be considered

24   running their specific family that they were involved in.

25   Q.    You don't know who the bosses are of the other families?

Curtis - Cross                                    43

1   A.   There's so disruption right now I couldn't tell you right

2   this second who the bosses were, but we have intelligence of

3   who was on the administration of these families over a period

4   of time.

5   Q.   So you only know the street bosses of this fam -- the

6   Colombo family --

7   A.   Because I only work the Colombo family.

8   Q.   You don't talk with other agents?  You don't know who the

9   street bosses are of the other families?

10  A.   I do if necessary.

11  Q.   Now, the street boss according to the FBI meet with

12  street boss or does the street boss meet with somebody else?

13  A.   He could meet with anybody in an administration of

14  another family or he could delegate that to his underboss of

15  his consigliere.

16  Q.   You testified earlier -- and by the way, the term "street

17  boss" is that an FBI term?  You guys made that up?

18  A.   I don't know who made it up.

19  Q.   Well, have you ever heard it on tape used, "street boss"?

20  A.   I may have.  I can't recall off the top of my head here.

21  Q.   That's a term you guys use, right, put in the indictment

22  to figure out a hierarchy, right?

23          MS. GEDDES:  Objection.

24          THE COURT:  Sustained.  He's answered the question.

25  BY MR. SCRIBNIK:

Curtis - Cross                                    44

1  Q.   Now, you testified earlier that your knowledge or

2  information that you received that Mr. Russo is the street

3  boss came from a cooperating witness and it was confirmed by

4  Anthony Russo and that's what I have written down in my notes

5  and --

6  A.   Came from three cooperating witnesses, two of which were

7  receiving their information from Anthony Russo or Joseph

8  Savarese and another individual who is a captain in the

9  Colombo family who received that information directly from

10 Andrew Russo.

11 Q.   Let me talk to you about -- let me ask you about these

12 cooperating witnesses.  Do they have -- do they cut deals with

13 the Government?

14           MS. GEDDES:  Objection.

15           THE COURT:  Sustained as to form.

16           MR. SCRIBNIK:  Well, can we identify who they are?

17           THE COURT:  No.

18           MS. GEDDES:  Objection.

19 BY MR. SCRIBNIK:

20 Q.   Do they have any prior convictions?

21 A.   Yes.

22 Q.   Okay.  Let's talk about -- let's call them cooperating

23 witness number one.  Tell us about his criminal record or

24 hers.

25           MS. GEDDES:  Objection.

```
                    Curtis - Cross                      45
```

1          THE COURT:  They have a criminal record, Counsel.

2          MR. SCRIBNIK:  Okay.

3          THE WITNESS:  All three of them have criminal

4   records, yes.

5   BY MR. SCRIBNIK:

6   Q.   And are all now cutting -- entering into plea agreements

7   with the Government?

8          MS. GEDDES:  Objection.

9          THE COURT:  Sustained.  Let's assume they are,

10  Counsel.  Where are we going with this?

11         MR. SCRIBNIK:  Well, we're going with attacking

12  their credibility, Your Honor.  I mean, that -- he's relying

13  on information provided by a cooperating wit --

14         THE COURT:  This is not a trial, okay?  I can't go

15  into each -- I understand they have been convicted.  They have

16  probably got prior felony convictions.  They probably are

17  entering into some sort of an agreement with the Government.

18  I'll take that as a given.

19         MR. SCRIBNIK:  Thank you, Your Honor.

20         THE COURT:  Let's move on.

21         MR. SCRIBNIK:  Yes.

22  BY MR. SCRIBNIK:

23  Q.   Now, let me take you to a meeting that you had on

24  November 7th, I believe, of last year.  Do you go visit Mr.

25  Russo?

Curtis - Cross                                    46

1   A.    Yes.

2   Q.    And was that at his --

3              THE COURT:  Which Mr. Russo?

4              THE WITNESS:  Andrew -- Andrew -- I spoke with

5   Andrew Russo in Florida.

6              MR. SCRIBNIK:  Okay.

7   BY MR. SCRIBNIK:

8   Q.    You actually went to his apartment, correct?

9   A.    Yeah.  His condo, yes.

10  Q.    His condo.  What floor is he on?

11             MS. GEDDES:  Objection.

12             THE WITNESS:  2511, I think the number was.

13  BY MR. SCRIBNIK:

14  Q.    And you went up there to visit him?

15  A.    I went there looking for his son Billy Russo because I

16  had a subpoena for him and I was in Florida anyway doing other

17  business so I figured I'd stop by that address because it was

18  associated with Billy Russo and see if Billy was there so I

19  could serve him with a subpoena.

20  Q.    Did you go by yourself?

21             MS. GEDDES:  Objection.

22             THE WITNESS:  Yes.

23             MR. SCRIBNIK:  Okay.

24  BY MR. SCRIBNIK:

25  Q.    And did you knock on his door?

Curtis - Cross                                        47

1  A.    Yes.

2           MS. GEDDES:  Objection.

3           THE COURT:  Sustained.  Where are we going?

4           MR. SCRIBNIK:  We're going with if he believes Mr.

5  Russo is a danger to the community I'd like to establish that

6  the nature of the meeting, the contact, what happened at that

7  meeting.

8           MS. GEDDES:  Objection.  That's beyond the scope of

9  what the agent has testified about.  This hearing was to

10 establish the defendant's position in the Colombo family.  The

11 Government has set forth other evidence establishing his

12 dangerousness.  Specifically in light of his position at

13 [inaudible] family he is de facto a danger to the community.

14          MR. SCRIBNIK:  I think I'm entitled to impeach his

15 conclusion that Mr. Russo is street boss by the circumstances

16 of that consensual meeting on November 7.

17          THE COURT:  I'll give you a little leeway but,

18 Counsel, I'm going to cut this off at five o'clock, so you've

19 got 20 minutes.

20          MR. SCRIBNIK:  Yes, Your Honor.

21          THE COURT:  And I really want you to get through

22 this tonight because otherwise you're going to start all over

23 tomorrow morning with Judge Mann and you're not going to be

24 here.

25          MR. SCRIBNIK:  Understood.  I'll be brief, Your

```
                    Curtis - Cross                        48
 1   Honor.
 2   BY MR. SCRIBNIK:
 3   Q.    This meeting -- you went by yourself, correct?
 4   A.    Yes.
 5   Q.    Were you armed?
 6   A.    Yes.
 7   Q.    Okay.  Did you show up at his apartment?
 8   A.    Yes.
 9   Q.    Knock on the door?
10   A.    Yes.
11   Q.    Did he answer?
12   A.    Yes.
13   Q.    Did he invite you in?
14   A.    Yes.
15   Q.    Give you a tour of the apartment?
16   A.    Yes.
17   Q.    Treat you nicely?
18   A.    Yes.
19   Q.    Did you feel threatened?
20   A.    No.
21   Q.    Call for backup?
22   A.    No.
23   Q.    You testified about a meeting on September -- or in
24   September of 2010 and I didn't get the exact day where you
25   said --
```

Curtis - Cross                                    49

1   A.     September 9th.

2   Q.     September 9th.  And you testified that it was a meeting

3   where a confidential source drove Anthony Russo to the

4   meeting.

5   A.     Yes.

6   Q.     But the confidential source was not actually in the

7   meeting?

8   A.     No.

9   Q.     Was that a recorded meeting, then?

10  A.     What transpired in the house and the meeting was not

11  consensually recorded.

12  Q.     Okay.  So the information -- the testimony you provided

13  today about that particular meeting was information that you

14  obtained based on a briefing of this confidential source.

15  A.     It was based on conversations that were overheard between

16  Anthony Russo and Benjamin Castellazzo while he drove them

17  away from the meeting back to Anthony Russo's house and later

18  on what Anthony Russo told that witness and another witness

19  about what had transpired.

20  Q.     Okay.  So it's -- just so I understand what his testimony

21  is your testimony is based on testimony provided to you by

22  confidential sources who relayed to you conversations that

23  they had with Anthony Russo about what happened at that

24  meeting.

25  A.     No.  It was consensually recorded.

Curtis - Cross                                    50

1  Q.   The conversations between the cooperating witness and

2  Anthony Russo was --

3  A.   Yes.

4  Q.   -- consensually recorded?  Okay.  Now, how many hours of

5  recorded conversations do you have in this case as a whole?

6  A.   This current indictment --

7  Q.   Rough.

8  A.   -- here we have over 400 consensual recordings.  Within

9  those recordings each recording could have six hours' worth of

10 recordings on it so I don't know what the total hours is.

11 Q.   Okay.  Over 400 recordings.

12 A.   Over 400 numbered recordings.

13 Q.   Over the course of how many years?

14 A.   Two years.

15 Q.   And in any of those -- or in those 400 or so recordings

16 any statement by Andrew Russo threatening anybody?

17 A.   Yes.

18 Q.   He testified to that already?

19 A.   On that tape on June 29th he gives out specific

20 instructions to Anthony Russo and to all the other captains

21 there regarding this situation that we've brought up with

22 Walter Samperi instructing them a situation -- if a situation

23 like this happens or somebody attacks one of us, one of our

24 individuals associated with the Colombo family, we retaliate

25 first.  That's what we do.  And then we'll sit down and we'll

Curtis - Cross                                    51

1   discuss matters after the fact.  He gives out those specific

2   instructions.

3   Q.   Any correction to threaten anybody, sir?  Name a single

4   victim whom he directed --

5   A.   He specifically did not threaten a victim.  He gives out

6   instructions.  That's his position in the family to give out

7   guidance and instructions to his subordinates.  He's

8   insulating himself.

9   Q.   That's your opinion.

10  A.   Based on experience.

11  Q.   How many agents do you have working this case?

12          MS. GEDDES:  Objection.

13          THE COURT:  What --

14          THE WITNESS:  About six or seven.

15          THE COURT:  Counsel, when she objects --

16          THE WITNESS:  Sorry.

17          THE COURT:  Sorry.  Agent, when she objects it helps

18  if you stand up, Ms. Geddes, because you are very soft-spoken.

19          MS. GEDDES:  Sorry.

20          THE COURT:  He might not catch it, but I can't rule

21  on her objections if you answer before I get a chance to do

22  that.

23          MR. SCRIBNIK:  May I have one moment, Your Honor?

24          THE COURT:  Of course.

25          MR. SCRIBNIK:  That's all I have.  Thank you, Your

Closing Argument                    52

1    Honor.

2            THE COURT:  All right.  Thank you.  Anything else,

3    Ms. Geddes?  Do you have any redirect?

4            MS. GEDDES:  No.

5            THE COURT:  Okay.  You can step down, Agent.

6            [Witness excused.]

7            THE COURT:  All right.  Arguments, Counsel, based on

8    the additional information proffered by the Government?

9            MS. GEDDES:  Your Honor, the Government will

10   begin --

11           THE COURT:  Do you want to come up, Counsel?

12           MR. SCRIBNIK:  Yes.

13           THE COURT:  You can stay seated if you wish, sir, or

14   whatever -- wherever you're comfortable.

15                   CLOSING ARGUMENT FOR THE GOVERNMENT

16           MS. GEDDES:  As Agent Curtis testified there's

17   sufficient evidence that the defendant Andrew Russo presided

18   over meetings of the high ranking members of the Colombo

19   family, the captains and the member of his administration.

20   Furthermore, there was a recording on which Andrew Russo was

21   captured accepting congratulations when he was introduced as

22   the *representante* or as Special Agent Curtis testified, the

23   boss.  Based on that, the Government submits there's been

24   ample evidence of the defendant's position in the Colombo

25   family and the only real challenge to that was whether or not

Closing Argument                                53

1   there's a distinction between the acting boss or the street

2   boss.  But regardless, the evidence was clear that from March

3   2010 when the defendant finished his term of supervised

4   release until the present when he was arrested he has served

5   as the street boss of the Colombo family, a violent criminal

6   organization.

7           In that capacity, the Government or the defendant

8   has ample individuals that carry out acts of violence at the

9   Colombo crime family and other organized crime families are

10  notorious for doing and with which the defendant is charged.

11  It is correct that he's only charged with a few predicate

12  acts; however, he's charged with a racketeering conspiracy and

13  specifically as the street boss who presided over that

14  racketeering enterprise and in that enterprise there were

15  numerous acts of violence for which given his position he was

16  ultimately responsible for.  Also, as presented by -- in the

17  Government's detention memo as well as Special Agent Curtis's

18  testimony the defendant was closely involved and interacted

19  with this captain and others and wanted to be kept apprised of

20  all of the affairs.  In light of that there's been significant

21  and certainly clear and convincing evidence that the defendant

22  poses a danger to the community should he be released.

23          MR. SCRIBNIK:  One second.

24          THE COURT:  Sure.

25          MR. SCRIBNIK:

1              CLOSING ARGUMENT FOR DEFENDANT

2         MR. SCRIBNIK:  Okay.  Just one correction before I

3    get to the argument.  I think the prosecutor made the

4    statement that he presided over the entire racketeering.  I

5    don't remember exact words, act or acts and the indictment I

6    believe charges a conspiracy between 2001 to 2011, at least in

7    Count I.  And by the Government's own --

8         MS. GEDDES:  That's correct, Judge.

9         MR. SCRIBNIK:  -- admission Mr. Russo does not

10   indeed become involved until March of 2010.

11        THE COURT:  I was assuming that she meant he

12   presided over the conspiracy from the time he allegedly took

13   the role of street boss in March of 2010.

14        MS. GEDDES:  That's correct, March of 2010.

15        MR. SCRIBNIK:  I just want to make it clear, Judge,

16   that the Court is aware that there are no allegations of

17   violence during that period of time during the conspiracy and

18   the indictment, so they characterize it as a violent

19   conspiracy when, in fact, they haven't made any allegations of

20   violence during the period of time they claim Mr. Russo

21   assumed the role of acting street boss.

22        THE COURT:  I see.  So your argument is that they've

23   stopped all activities since he took control?

24        MR. SCRIBNIK:  No.  I'm just saying they haven't

25   alleged any violent acts during the period of time they

Closing Argument                                55

1   claimed he assumed the position of acting street boss.  And I

2   think that's important to the Court's consideration with

3   respect to whether or not bail is appropriate here.

4            MS. GEDDES:  Your Honor --

5            MR. SCRIBNIK:  Where's the violence?  There's no

6   violent -- there are no allegations of violence during this

7   period of time that they claim he assumed that position.

8            MS. GEDDES:  Your Honor, if I could respond to that

9   briefly there are actually numerous instances of violence

10  which are contained in the indictment.  There are various acts

11  where the defendants were charged with using extortionate

12  means to collect loans.  Some of those acts are detailed in

13  the detention memorandum where individuals brandish knives in

14  order to collect money.  There's another instance where

15  individuals used a baseball bat to assault an individual who

16  they perceived was interfering with a gambling operation of

17  the Colombo families.  Those are just two instances of acts of

18  violence that the Colombo family committed between -- or

19  during the time that the defendant Andrew Russo was street

20  boss of the family.  There are other --

21           THE COURT:  Those all occurred after March of 2010.

22           MS. GEDDES:  Yes, Judge.  And they're charged as

23  racketeering acts in the indictment.

24           THE COURT:  Okay.  Okay.  I was confused.  Okay.

25  Thank you.  All right.

Closing Argument                                   56

1          Counsel, I'm sorry.  Go ahead.

2          MR. SCRIBNIK:  Yes, Your Honor.  Let's take a step

3    back for one second and with the burden that the Government

4    has to carry here is to show the Court by clear and convincing

5    evidence that Mr. Russo is a danger to the community.  I

6    assume we've seen their best evidence over the course of 400

7    recordings.  We've seen they've cherry-picked the very best.

8    Of course, I haven't seen or heard the entire trans -- tapes

9    and I'd like to read the transcript, but I'm going to proceed

10   under the assumption that they've gone back there and decided

11   to pick the very best for the Court.

12          And what I have heard and what I've seen, number

13   one, does not establish by clear and convincing evidence that

14   Mr. Russo is the street boss of the family.  For starters --

15   whatever that term means -- for starters we note that the

16   Government throws those labels around left and right.  And I

17   can proffer to the Court that not only have they alleged that

18   this gentleman Gioeli was a street boss in Massachusetts, in a

19   case in Massachusetts the Government claimed that a gentleman

20   named Ralph DeLeo was the street boss at one point.  And, of

21   course, we heard from the agent that the Government alleged

22   that Tommy Gioeli was the acting boss in the indictment.

23          So it seems that the Government when it is

24   convenient for the Government will throw around terms like

25   "acting boss" and "street boss" and use them interchangeably.

Closing Argument                                           57

1   When I asked the agent about who is the head of the

2   administration of the other families I assume an agent of 14

3   years with experience would be able to tell me who the so-

4   called bosses are of the other families and he can't even tell

5   me which -- what that tells me, Judge, is that they just use

6   those terms as is convenient.  One is a street boss now, the

7   other is a street boss then and you can't give any credit to

8   it especially since we know that there's a history of --

9           THE COURT:  Counsel, I don't care about the terms.

10  I've heard the testimony regarding what the cooperating

11  witnesses say about your client and what he has done in

12  connection with presiding over meetings involving other

13  captains.  If you want to make another argument, I understand

14  what you're saying.  I'm not buying it with respect to the

15  Government messing up the terms.  Try me on something else.

16          MR. SCRIBNIK:  Yes, Your Honor.  The case United

17  States v. Cirillo, which is the Second Circuit case at 312

18  F.3d 535, the Second Circuit declined -- specifically declined

19  to embrace the idea that somebody in the position of boss is,

20  per se dangerous or per se detainable.  More is required and I

21  repeat to the Court in Cirillo says:

22          "In any event to the extent that the District

23  Court's characterization of our pretrial detention precedence

24  as creating a per se rule with respect to people in Gotti's

25  alleged position was not gratuitous dicta.  We declined to

Closing Argument                              58

1    embrace it.  Each of our precedence relied on by the

2    magistrate judge in the District Court in ordering that Gotti

3    be detained pending trial without bail include a fact

4    intensive analysis that the quality and quantity of the

5    evidence produced at the bail hearing in determining the

6    defendant's role in the violent RICO enterprise alleged and

7    whether the acts committed by the enterprise combined with his

8    leadership role in the enterprise justified pretrial

9    detention."

10            We know this man is 76 years old.  They've looked at

11   him for many, many years.  Not a single act in his history of

12   violence towards anyone, not any evidence of weapon, not any

13   evidence of direct threats, not any evidence of instructing

14   people to harm anyone, none.  And so while in some cases the

15   Court might be able to draw an inference -- an inference from

16   somebody's role in an enterprise that the person embraces

17   violence or engages in violence, that's not a reasonable

18   inference to draw in this case.  There's simply no evidence in

19   Mr. Russo's past that he is somebody who poses a danger of

20   harm to anybody else.  So regardless of the labels that the

21   Government chooses to put on him we would submit that that

22   label in and of itself cannot under Second Circuit law carry

23   the day for the Government and does not.

24            Now, I did proffer to the Court all of the people

25   who are here who -- and the Court has read the letters.  These

Closing Argument                                    59

1   are people who obviously support Mr. Russo and believe he is

2   not a danger to the community.  I think the overwhelming

3   support that Your Honor sees in this courtroom is testament to

4   the fact that he is not a violent person.  He's not a person

5   who embraces harm toward others.

6           I do want to submit for the record a list of people

7   who have actually proposed to put up -- you know, to act as

8   sureties for any bail that the Court would set.  And there's

9   some handwritten -- these people -- I'll present a clean copy

10  to the Court, but there are one, two, three -- 11 individuals

11  or couples who have agreed to post or act as sureties for Mr.

12  Russo and there are varying amounts and degrees of equity in

13  their various properties.

14          THE COURT:  Are you going to put that on the record

15  or --

16          MR. SCRIBNIK:  Well, I was going to actually hand it

17  up to the Court and mark it as an exhibit a list for the

18  Court.  I think we're at Exhibit Number 3.

19          (Exhibit Number 3 marked for identification.)

20          THE COURT:  Yes.

21          MR. SCRIBNIK:  As the Court knows there were

22  individuals who were here ready to speak on Mr. Russo's behalf

23  and if I could ask at least one of them to come address the

24  Court.

25          THE COURT:  That's fine.  Go ahead.

1          MR. SCRIBNIK:  Ask him to describe his relationship,

2   how he knows Mr. Russo.

3          UNKNOWN SPEAKER:  This is a friend of my parents.

4   My parents are deaf.  He's been friends with my parents and my

5   uncle who is deaf and him as a little boy.  And he learned

6   sign language to help my father get a job and my uncle.  And

7   he started learning sign language.  And all through the years

8   he's always helped so many deaf people.  Medical reasons, they

9   have tax issues.  He helped them filling out papers.  It's

10  hard to describe.  He's really a great man to me.

11         MR. SCRIBNIK:  Now, have you seen this with your own

12  eyes?

13         UNKNOWN SPEAKER:  Yeah.  I grew up with this, yes.

14  Um-hum.  Yes.

15         MR. SCRIBNIK:  Have you actually presented people

16  from Mr. Russo to help?

17         UNKNOWN SPEAKER:  Yeah.  There's some of them here.

18  I brought them.  Yeah.  You mean to help --

19         MR. SCRIBNIK:  Well, to help fill out forms, for

20  example.

21         UNKNOWN SPEAKER:  Oh, yeah, yeah.

22         MR. SCRIBNIK:  To serve as an interpreter?

23         UNKNOWN SPEAKER:  To serve a interpreter.  Yes, yes.

24         MR. SCRIBNIK:  And to try to get them jobs?

25         UNKNOWN SPEAKER:  Yes.  Yes.  We even used to go --

1   he even went to the Social Security office with my uncle and

2   help my uncle out because he didn't understand anything they

3   were saying to him and they didn't provide interpreters back

4   then and he acted as an interpreter and helped them so he

5   could get money to live and eat.

6            MR. SCRIBNIK:  So he actually went -- Mr. Russo went

7   into the Social Security office --

8            UNKNOWN SPEAKER:  Yes.

9            MR. SCRIBNIK:  -- and helped people out?

10           UNKNOWN SPEAKER:  Yes, yes.

11           MR. SCRIBNIK:  Nothing further, Your Honor.

12           THE COURT:  Could you thank him for me?

13           UNKNOWN SPEAKER:  Thank you.

14           THE COURT:  And I appreciate the fact that you came

15  down here today along with all of your friends and relatives

16  who are here to present your side to the Court.  I take the

17  community support very seriously in considering these things

18  and I certainly respect your position.

19           UNKNOWN SPEAKER:  Thank you, thank you for many,

20  many, many deaf people have -- he has supported a lot of deaf

21  people that just weren't able to be here.  He has supported a

22  lot of deaf people and we all love him very much.

23           THE COURT:  I appreciate that.  Thank you.

24           UNKNOWN SPEAKER:  Thank you.

25           MR. SCRIBNIK:  Judge, I just want to point out to

1   the Court that with respect to the names of the proposed

2   sureties combined they probably make in excess of a million

3   dollars a year W-2 income.  You have dentists, nurses,

4   paralegals, teachers, people who work for networks.  These are

5   friends and family members of Mr. Russo who understand that if

6   he were to violate the conditions of his release that they

7   would be responsible for whatever bail Your Honor set.

8   Notwithstanding all the audio tapes and the testimony, the

9   hearsay testimony of the agent who testified, I didn't hear

10  any allegation of violence that Mr. Russo was a dangerous man.

11  There was some testimony that related to an allegation that he

12  said that members of the Colombo family should have retaliated

13  rather than talk about money.

14          Judge, I listened to that audio recording and that's

15  a gross mischaracterization of what the conversation consisted

16  of.  In fact, it's belied -- okay.  Then that would explain

17  why it was a mischaracterization.  The Government is telling

18  me that I didn't hear that tape.  I did, though, read the

19  indictment and the allegations in the indictment make clear

20  that Mr. Russo was involved in seeking to get medical bills

21  paid.  I don't -- I didn't see any verbatim -- and I would

22  think that they would include that because they did in other

23  parts include verbatim language by the various defendants.  I

24  didn't see any language consistent with what this agent

25  testified to.  And I would think that if Mr. Russo, in fact,

63

made statements and made certain directions to people that

that would have been contained in the indictment or that the

tape more importantly would have been played to the Court.

And that testimony was the only testimony that Your Honor

heard that attributed any type of violent conduct to Mr.

Russo.

Aside from that they have conspiracies that are

alleged.  No actual violence or any directive on the part of

Mr. Russo for others to engage in violence.  And the agent

testified that Tommy Gioeli was the acting street boss, just

like he testified Mr. Russo now is the street boss.  He said

his reign ended when he was arrested.  If that's true, Mr.

Russo stands before the Court not a boss of anything.  Maybe

the boss of his own family members that are sitting here in

court, but if the agent's testimony is credited he stands

before the Court not a boss of anything and the Court

shouldn't be able to use that as a *per se* basis to detain him

and deny him bail.  He should be treated like any other

defendant and the Court should take a look at the actual

allegations in the indictment.  And I think in this instance

it's appropriate to set some type of reasonable bail with

reasonable restrictions that ensure he's monitored while this

case goes forward.

MR. GALGANO:  And that would include, Your Honor,

electronic monitoring, remain at his home.  Certainly there

64

1  are ways now of ensuring that a defendant is confined to his

2  home pending trial and we would suggest that the Court propose

3  any such conditions that are available under the circumstances

4  of this case.

5       THE COURT:  All right.  Ms. Geddes, did you have

6  something you wanted to add?  You look like you were going to

7  say something [inaudible] --

8       MS. GEDDES:  No, Your Honor.  I would only state

9  that in the detention memo we actually do quote the defendant

10 with respect to that meeting where he observed that they

11 should have "gotten even" and then initiated discussions with

12 the Gambino family only --

13      MR. SCRIBNIK:  But that's much different from what

14 that agent testified to that he gave a directive for

15 individuals to go out and retaliate and that he actually

16 directed violence.  Even if that's true, even if you accept

17 that, that's Mr. Russo saying, hey, this is what you should

18 have done if it's true and I haven't listened to it and the

19 quality of the evidence the Court has to consider.  We didn't

20 hear the tape.  We heard an agent talk about the tape and we

21 didn't get to listen to the tape.  But even if that's true

22 that's much different from what the agent testified to.  Just

23 seems to me unfair to detain the man pending a trial that's

24 going to last as long as this trial is going to last given the

25 limited involvement the Government alleges as to him when you

65

1   have 11 people who are willing to essentially post their lives

2   on him coming back to court and not violating the conditions

3   of his release.

4           THE COURT:  Anything, Ms. Geddes?

5           MS. GEDDES:  Your Honor, just briefly.  The Second

6   Circuit has made clear that home detention, electronic

7   monitoring, elaborate bail packages are not sufficient to

8   protect the community from individuals such as the defendant

9   who are leaders of violent criminal organizations.  And I do

10  just want to make clear for the record that the Government's

11  argument is not that merely because the defendant served as a

12  street boss he should be detained.

13          The Government's argument is that the defendant

14  served the street boss of a violent criminal organization that

15  was committing violence and that he presided over and had very

16  close contact with the individuals who were committing this

17  violence and based on that is why the defendant should be

18  detained.

19          THE COURT:  All right.  Well, before I render my

20  decision here I will -- I just want to put on the record for

21  purposes of appeal should there be one that the Exhibit Number

22  3 that defendants have proffered contains potential sureters

23  including nieces, nephews, cousins, sisters, friends,

24  grandsons, sister-in-laws, all of whom look as though they've

25  proffered up property I'm assuming.  That's what this is in

1    the value column, right?

2           MR. SCRIBNIK:  That's correct, Judge.  It's all real

3    property.

4           THE COURT:  Okay.  With amounts resulting in an

5    equity of 4.8 million dollars.  Is that accurate?  That's the

6    proffered security at this point.

7           MR. SCRIBNIK:  That's correct, Judge.

8           MR. GALGANO:  That's the estimate.

9           THE COURT:  Okay.  All right.  All right.  Well,

10   we've had a lot of conversation here about what the law is.

11   Obviously the issue here is not whether or not Mr. Russo has

12   personally committed violence.  The Government is not raising

13   that as its argument in moving for detention on grounds of

14   dangerousness.  Instead, the Government has proffered evidence

15   that frankly has not been controverted at this point, that Mr.

16   Russo is or was the street boss of the Colombo crime family

17   during the period from March of 2010 until I assume his arrest

18   and that he poses a serious danger to the community in his

19   role as street boss presiding over high ranking members of the

20   organization ordering and directing their activities, which is

21   information based on the agent's testimony coming from not

22   only the numerous recordings that we've discussed and

23   surveillance by the FBI but also information from confidential

24   informants -- several confidential informants who according to

25   the testimony have each provided corroborating evidence that

67

1   the defendant is, in fact, or has been since March the street

2   boss responsible for directing the Colombo crime family while

3   the actual bosses are in custody.

4              We also have evidence proffered by the Government

5   that during this period of time members of the racketeering

6   enterprise engaged in violent criminal activities including

7   among other things extortion which by its very nature is

8   considered to be an act of violence under the bail or format

9   and that threats of force and intimidation are used to collect

10  monies and force others to engage in acts in response to those

11  threats.  I think that's actually something that was noted in

12  the United States v. Defitti [ph.] case which counsel, I

13  believe, you brought to the Court's attention earlier this

14  morning.

15             I have considered all of these things.  I find by

16  clear and convincing evidence that the Government has

17  established for purposes of bail that there is a serious

18  danger to the community based on the defendant's role.  It is

19  not a *per se* finding that I am making.  It is a finding based

20  upon the testimony of the agent and the activities of the

21  enterprise as defined by the agent and also as described in

22  the indictment.

23             And while I understand that there is contrary

24  evidence to suggest that Mr. Russo has provided assistance and

25  aided members of the community which obviously is a laudable

68

1  thing, that does not rebut or counteract the concern that the

2  Court has about releasing him at this time.  As the Government

3  noted, the Second Circuit has previously held in <u>United States</u>

4  <u>v. Scottie</u> [Ph.] and <u>United States v. Erena</u> [Ph.] that

5  stringent conditions of release for people such as Mr. Russo

6  are not sufficient when we have a finding of danger to the

7  community.  So based on all that I'm going to order the

8  defendant be detained pending trial.

9          Obviously, Counsel, you are free to take this up

10  with the miscellaneous judge -- or I guess the judge on the

11  case, Judge Townes.  I don't know when she's able to see you,

12  but I would certainly suggest that you try to get in touch

13  with her as soon as possible if you wish.

14          MR. SCRIBNIK:  Yes, Your Honor.  May I make one

15  request and that is -- certainly since we expect to receive

16  transcripts or at least the recordings themselves within the

17  week, we're obviously going to go through them as quickly as

18  possible.  What we heard today was a summary of that.  We

19  waited several hours and we ended up not hearing the tapes

20  themselves.  We just heard a summary we could have heard

21  earlier in the agent's interpretation.

22          Upon reviewing the actual transcripts themselves, we

23  may seek to revisit the idea or the issue of detention before

24  Your Honor based on new information.  I just want to at least

25  put on the record that in our view the tapes and transcripts

69

1  would constitute new information because we did not have them

2  available to us today.

3                THE COURT:  Well, Counsel, you're always free to

4  come back to me if you wish or take it up with Judge Townes.

5                MR. GALGANO:  Thank you, Your Honor.

6                MR. SCRIBNIK:  Judge, thank you.

7                THE COURT:  Thank you.

8                (Proceedings concluded at 5:17 p.m.)

9                            *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

70

1          I certify that the foregoing is a court transcript

2     from an electronic sound recording of the proceedings in the

3     above-entitled matter.

4

5

6     _____

7                              Ruth Ann Hager

8     Dated:  January 28, 2011

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25