GALGANO & ASSOCIATES
ATTORNEYS AT LAW

CROSSWEST OFFICE CENTER
399 KNOLLWOOD ROAD
WHITE PLAINS, NEW YORK 10603

TELEPHONE: (914) 428-2323
FAX: (914) 428-3298

June 7, 2012

Hon. Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *United States v. Andrew Russo*
             Indictment No.: 11-CR-30 (KAM)

Dear Judge Matsumoto:

      On May 18, 2012, Your Honor set a briefing schedule in connection with Mr. Russo's application to review his final order of detention. Mr. Russo's reply was to be filed by June 5, 2012, which turned out to be the same day that I received the Government's papers in opposition to the motion. I write this letter in reply to the Government's opposition papers and to also ask that I be permitted to supplement my reply on or before Monday, June 11, 2012 for the reasons set forth below.

      Mr. Russo is quite ill and suffers from a variety of serious medical conditions, including chronic kidney disease. Apparently, on June 5, 2012 he was taken from the Metropolitan Detention Center to a local hospital for emergency medical treatment. Neither Mr. Russo nor myself were notified in advance that he would be leaving the facility. For the last few weeks, I have attempted to obtain updated medical records from MDC in anticipation of the upcoming bail hearing on June 19, 2012. On Wednesday June 5, 2012, family members were turned away when they sought to attend a regularly held Wednesday visit at MDC. Prison officials would not say why Mr. Russo was not allowed a family visit. They did not receive any e-mails or phone calls throughout the remainder of the day or into the night. Given Mr. Russo's medical condition and his history of keeping in close contact with his elderly wife and children, this silence was particularly alarming.

      This morning I contacted the legal department at MDC to ascertain if there was a problem with Mr. Russo. In explaining the situation, I asked staff attorney, Nicole Mcfarland if Mr. Russo remained at MDC or if he was transferred elsewhere

for some reason. For "security reasons," she said that she could not tell me one way or another whether Mr. Russo remained at MDC but that I could go down and attempt to see him. When I expressed my desire to avoid an unnecessary trip to Brooklyn, Mr. Mcfarland said she could not help me but that I could come down and see what happens. When I arrived today, the corrections officer at the desk told me that Mr. Russo was not there and that she did not know where he was. She told me to check the national inmate locator and gave me a phone number. After four hours of phone calls to a variety of government agencies and local hospitals, we now believe that Mr. Russo is at New York Methodist Hospital in Brooklyn.

A few moments ago, I again spoke to Ms. Mcfarland and requested that she grant me permission or security clearance to meet with Mr. Russo at the hospital. While she refused to confirm Mr. Russo's specific whereabouts, she indicated that she would advise me tomorrow whether I would be able to meet with him. Obviously, I need to discuss some of the allegations made in the Government's recently filed papers in opposition to our request for bail.

But even without the benefit of Mr. Russo's participation, the Court should take note that there is absolutely no evidence that Mr. Russo "Has Sanctioned Crimes of Violence." *See* Letter of Elizabeth Geddes dated June 5, 2012 at p. 6. Notwithstanding the fact that my letter detailed the context under which the words "get even" were spoken, the Government continues to distort and mislead the Court by writing that in response to the Samperi stabbing "Russo observed that they should have first 'g[o]t even' and then initiated discussions..." *Id.* at p.7. However, the conversation among the men clearly indicates that Mr. Russo admonished Anthony Russo for taking his own initiative to engage in discussions that may have been misconstrued as threatening. And in encouraging Anthony Russo to refrain from future unilateral decision-making, he merely observes that the first reaction someone has when someone hurts a friend is to "get even" but that given Samperi's injuries this is impossible. The group of men then engages in the think tank type of discussion that Mr. Russo encouraged to Anthony Russo to and brought up a variety of possible non-criminal, peaceful and completely lawful ways to help Samperi. There was not one mention of violence. There was no discussion of threatening, hurting or otherwise retaliating against the people responsible for Samperi's injuries. Notwithstanding the complete absence of suggestion to engage in violence and the hours of discussions involving civil lawsuits and fundraising dinner dances, the Government continues to make unfounded statements like, "They ultimately agreed that, in exchange for their promise not to retaliate, the Colombo crime family would require the Gambino family to make a one-time payment..." *Id.* at 7, 19.

The conspiracy to extort and collect a debt from John Doe #16 is also barren of any facts to substantiate that Mr. Russo ever conspired with Anthony Russo or others to threaten or demand money for a debt. Nowhere in the portion of the transcript cited by the Government, *Id.* at 8, does Mr. Russo instruct or even insinuate that anyone should contact Gino Pesce or ask him for the money Mr. Russo believed he owed Mr. Castelluccio. And notwithstanding the fact that Anthony Russo

2

is now a star prosecution witness, the Government's papers fail to substantiate by way of proffer what Anthony Russo would say with respect to this alleged conspiracy between the two men. Instead of citing to recorded facts or relying on unrecorded statements from Anthony Russo who is currently cooperating, the Government states "Andrew Russo did not need to have this discussion with [Anthony Russo] who he knew was schooled in organized crime and in collecting outstanding debts." *Id.* at 18.

Aside from the two aforementioned charged conspiracies, in urging continued detention, the Government also relies on a single conversation between Mr. Russo and a gentleman named Neil Migliore where the men talk about "someone" who owes "someone" else money. Mr. Migliore, who is not alleged to be part of the Colombo' organization, brings the subject up thinking that Mr. Russo was friendly with the debtor. Mr. Russo responds by telling Mr. Migliore that the debtor is not a friend of his and that some other creditor had apparently made the same assumption of friendship among the men weeks earlier. Had Mr. Russo encouraged Mr. Migliore to hold off on collection efforts because he knew the debtor, the Government would have charged him with an extortion conspiracy. Had Mr. Russo responded by saying that Mr. Migliore should hire a collection attorney that he knew, he might have even been charged with some type of conspiracy. But instead, the transcript provided by the Government proves that Mr. Russo did nothing, offered no advice to either creditor and refused to inject himself into the controversies surrounding the transactions between the parties. Yet somehow this story finds its way into the Government's papers urging the continued detention of the hospitalized, 77 year old defendant who has no history of violence in his criminal record.

Judge, I am hopeful that I will be able to briefly meet with Mr. Russo tomorrow at the hospital. I ask until Monday, June 11, 2012 to supplement this filing in anticipation of the scheduled bail hearing. Early this morning, a new global plea offer was made by the Government, which does not require the participation of defendant Scopo. I also intend to discuss this matter with Mr. Russo. Should a hearing no longer be necessary due to a tentative plea deal, I will confer with AUSA Geddes and advise the Court at the earliest possible time.

Thanking you for your consideration of this matter, I remain,

Respectfully yours,

George Galgano